**BANCO PARA EL COMERCIO EXTERI-OR DE CUBA, Libelant,**

v.

**THE Steamship RUTH ANN, her engines, tackle, apparel, equipment, etc., in rem, and P & E Shipping Corporation, and all persons lawfully intervening for their interests in said steamship, etc., in personam, Respondents.**

No. 12–60.

United States District Court
D. Puerto Rico,
San Juan Division.

April 4, 1961.

608

Hartzell, Fernandez & Novas, San Juan, P. R., for libelant.

Isaias Rodriguez Moreno and Elmer Toro Luchetti, San Juan, P. R., for respondent.

RUIZ-NAZARIO, District Judge.

Libelant, Banco para el Commercio Exterior de Cuba, is a banking corporation organized and existing under and by virtue of the laws of the Republic of Cuba.

Respondent, S.S. Ruth Ann, is a Liberian vessel, flying the Liberian flag, and the other respondent P & E Shipping Corporation is a corporation organized, created and existing under and by virtue of the Laws of the Republic of Liberia, and is the owner of the S.S. Ruth Ann.

There is evidence to the effect that all the stockholders of respondent P and E Shipping Corporation are American citizens.

Respondents have unsuccessfully endeavored to pierce the corporate veil of said corporation and have the court hold that the S.S. Ruth Ann is individually owned by three American citizens.

Although mindful that the corporate respondent has no standing in law to challenge the legality of its own existence as a Liberian corporation, the court on the second day of trial gave it an opportunity to produce all evidence it might have in support of said contention, but it failed to do so.

The evidence shows that the S.S. Ruth Ann, was, at the time it entered into the contracts in question here, a general ship engaged in the common carriage of merchandise on the high seas for hire between agreed ports, but said evidence fails to show that said vessel was at said time, or has been at any other time material to this action, a regular carrier of goods with a fixed and pre-established route and itinerary between ports in the United States and Canada and Havana, Cuba.

Now, the evidence produced at the trial herein unquestionably established that respondent P and E Shipping Corporation contracted to carry and transport from Port Huron, Michigan and from St. Johns, New Brunswick to Havana, Cuba, on board the S.S. Ruth Ann, the shipments of potatoes and beans, consigned to libelant to which reference is made in the amended libel herein, as further amended at the trial.

These contracts are evidenced by Bills of Lading (Exhibits 1, 2, 3 and 4 Libel.) issued by said respondent on Sept. 22 and October 18, 1960, the consignee in all of them being libelant herein Banco para el Commercio Exterior de Cuba, Havana. All of them are clean bills of lading and each of them shows that the freight was prepaid on board. The total prepaid freight amounted to $108,803.91 and this was included in the total amount of $545,-619.41, paid by the libelant for the goods and which it claims in its suit herein.

The beans consisting of 40,000 bags "Pea Beans" American White Beans (34,850 bags being U. S. No. 1 and 5150 bags U. S. No. 2) were taken on board the S.S. Ruth Ann at Port Huron, Michigan and are covered by Bills of Lading, Exhibits 1 and 2 Libelant, both dated September 22, 1960.

The potatoes consisting of 56,861 bags, 100 lbs. each Pippin brand (50,360 bags Canada No. 1, two inches minimum table potatoes and 6501 bags U. S. Number 1, 1⅞ inches minimum table potatoes) were taken on board the S.S. Ruth Ann at St. Johns, New Brunswick, and are covered by Bills of Lading, Exhibits 3 and 4 Libel., both dated October 18, 1960.

At the time that said contracts, evidenced by the four bills of lading above mentioned (Exh. 1 to 4 Lib.) were executed, the political situation in the Republic of Cuba was quite unsettled.

Numerous citizens, including some Americans had been executed by firing squads.

Very valuable property not only of Cubans but of American businesses had been confiscated by the dictatorial communist influenced government of Fidel Castro.

Fidel Castro, his brother Raul and Ernesto (Che) Guevara had subjected everybody and everything in Cuba to their ruthless, predatory regime of terror.

Che Guevara was the Director of the Banco Nacional de Cuba, which in turn owned all the stock of libelant herein.

All the business and properties of The Chase Manhattan Bank located in Cuba had been confiscated by the Cuban dictatorship since September 16, 1960. (So it was conceded by counsel for the respondent—Transcript, pp. 175–176).

Neither the Master nor any of the members of the crew of the S.S. Ruth Ann were American citizens, and only the Master was a resident of the United States.

All the above facts were known or should have been known by the respondents when they took on board the S.S. Ruth Ann the cargo of potatoes and beans in question and issued the four bills of lading (Exh. 1 to 4, Libel.), in favor of libelant, as consignee, and contracted to deliver said cargo in Havana, Cuba.

In addition, they knew that the S.S. Ruth Ann was mortgaged for $80,000 in favor of the The Chase Manhattan Bank, whose business and properties in Cuba had been already confiscated by the Castro dictatorship.

Under their contracts with libelant respondents were bound to unload in Havana, Cuba all the potatoes and beans which were the subject thereof, and they had contracted to bear all the expenses of such unloading.

From the letters of September 6th and 16th, 1960 (Exhibits 11 and 12 Resp.) and the cablegrams therein mentioned, respondents, prior to the execution of the contracts with libelant, evidenced by the bills of lading (Exhibits 1 to 4 libel.), had knowledge that the stevedoring and other charges for unloading the merchandise in Havana were likely to increase substantially, as they were warned of this possibility in the first of said letters (Exh. 11, Resp.) as well as in the second letter (Exh. 12, Resp.).

They had quite a clear view of what the situation in Cuba was at the time and of the risks they were likely to encounter on a voyage from Canada and the United States to deliver cargo in Havana.

Nevertheless they took the risk and entered into the contracts in which libelant had invested a substantial amount of money of which the sum of $108,803.91 represented prepaid freight received by respondents.

Each and everyone of the Bills of Lading issued by respondents in favor of libelant, as consignee, contained provisions stating that they "shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States approved April 16, 1936, which shall be deemed to be incorporated herein." (See Term 1 of each bill of lading).

All of them also contain condition or Term No. 4, which reads as follows:

"4. In any situation whatsoever or wheresoever occurring and whether existing or anticipated before commencement of or during the voyage, which in the judgment of the Carrier or master is likely to give rise to capture, seizure, detention, damage, delay or disadvantage to or loss of the ship or any part of her cargo, or to make it unsafe, imprudent, or unlawful for any reason to begin or continue the voyage or to enter or discharge the goods at the port of discharge, or to give rise to delay or difficulty in arriving, discharging at or leaving the port of discharge or the usual place of discharge in such port, the Master or Carrier, whether or not proceeding toward or entering or attempting to enter the port of discharge or reaching or attempting to reach the usual place of discharge therein or attempting to discharge the goods there, may, without giving any prior notice, *discharge* the goods into de-

pot, lazaretto, craft, or other place and the goods shall be liable for any extra expense thereby incurred, or the Master or Carrier may proceed or return, directly or indirectly, to stop at such other port or place whatsoever as he or the Carrier may consider safe or advisable under the circumstances, and *discharge* the goods or any part thereof there without giving any prior notice and, *when landed as hereinabove provided,* the goods shall be at their own risk and expense, the *delivery thereof* by the Carrier *shall be considered complete and the Carrier shall be freed from any further responsibility in respect thereof* except to mail notice of the disposition of the goods directed to the shipper or consignee named in this bill of lading at such address as may be stated herein; or the Master or Carrier may retain the cargo on board until the return trip or until such time as he or the Carrier thinks advisable; or the master or carrier may forward the goods by any means by water or by land, or by both such means, at the risk and expense of the goods. For any services rendered to the goods as hereinabove provided, the Carrier shall be entitled to a reasonable extra compensation.

"Another vessel may be substituted for the ship, without notice, whenever and wherever the Carrier deems it desirable, whether or not the substituted vessel be owned or operated by the Carrier, or arrives or departs or is scheduled to arrive or depart before or after the ship." (Emphasis supplied.)

So it was that on October 19th, 1960 almost at midnight, the S.S. Ruth Ann sailed from the Port of St. Johns, New Brunswick en route to Havana to perform the contracts it had with libelant (Exhibits 1 to 4 Libel.).

On the way between St. Johns and New York, as testified by the Master of the Ruth Ann at the trial, they heard over the radio after midnight of October 20; 1960, that the United States had placed an embargo on shipments to Cuba.

She arrived in New York on October 22, 1960 and as soon as the ship moored, Mr. Shayne one of the officers of the carrier-respondent and Mr. Gatto, shipping broker, came aboard.

On the same day, October 22, 1960, the S.S. Ruth Ann sailed from New York toward Bermuda; arriving at Bermuda on October 25, 1960.

While the vessel was en route to Bermuda, on October 24, 1960 respondents sent to libelant the cablegram (Exh. 9 Lib.) demanding immediate posting in New York of a bond for $750,000 as security to the vessel and its owners and *mortgagees* to cover the safe return of vessel, master and crew *upon completion of discharge,* immediate payment for any loss, detention, demurrage to vessel or crew; reimbursement for any additional insurance fees accruing due to nature of voyage. Bond to be posted within 48 hours after said notification, otherwise vessel was to proceed to a U. S. Port and "cargo *will be discharged* and vessel and/or owner's liability will cease and voyage will be deemed terminated". (Emphasis supplied.)

On October 29, 1960, respondents sent their cablegram (Exh. 2 Resp.) along the same lines as their previous cablegram. No notice that the S.S. Ruth Ann was to proceed to San Juan, Puerto Rico, to be unloaded there had yet been given to libelant.

The S.S. Ruth Ann arrived at San Juan, Puerto Rico on October 30, 1960.

Whereupon libelant on November 4, 1960 filed this suit in Admiralty against the S.S. Ruth Ann, her engines, tackle, apparel, equipment, etc. in rem, and against P & E Shipping Corporation and all persons lawfully intervening for their interests in said steamship, etc. in personam.

As per its amended libel, libelant claims damages for the alleged willful and unlawful deviation of the S.S. Ruth Ann from her proper course and destination, and the loss of the full value of the goods

belonging to libelant for impossibility and failure of delivery, deliberately caused by respondent. Although the total damages claimed under the amended libel allegedly amounted to $800,000, this sum was reduced at the trial to the amount of $545,-619.41 prepaid price of the goods, freight included, landed in Havana, Cuba.

Respondent's defense was that the change of course of the S.S. Ruth Ann to San Juan, Puerto Rico, was not a deviation, but that even if it was, such deviation was reasonable under term 'or condition 4 of the bills of lading issued to libelant and the provisions of the Carriage of Goods by the Sea Act (Title 46 U.S.C.A. § 1304(4)) and, therefore, could not be deemed an infringement or breach of the contracts of carriage entered into with libelant, respondent not being liable for any loss or damage resulting therefrom.

The suit was tried, evidence was adduced, memoranda were filed and the controversy came under submission shortly before I became ill and had to be hospitalized and remain under medical treatment for a period of over two months. Now, upon being advised that I can resume my judicial duties and after having given due consideration to the evidence, which has been fully transcribed by the reporter, to the pleadings and the whole record of the proceedings in this case, to the memoranda of counsel and to the law applicable in the matter, I now feel duly advised to decide the case on the merits.

All the controversy herein is limited to the determination of whether respondents infringed or breached the contracts of carriage (Exhibits 1 to 4 Libel.) or whether the evidence, in view of term or Condition 4 of said contracts, quoted supra, and the provisions of the Carriage of Goods by Sea Act, Sec. 1304(4), Title 46 U.S.C.A., justifies a determination that the deviation of the S.S. Ruth Ann to San Juan, Puerto Rico was reasonable and therefore, should not be deemed to be an infringement or breach of said contracts.

The first question raised by respondents, citing cases thereon, is that their action in changing the course of the S.S. Ruth Ann does not amount to a deviation under Sec. 1304(4) of Title 46 U.S.C.A., because under the provisions of Term or Condition 3 of the Bills of Lading the Ruth Ann could have sailed beyond the port of discharge (Havana) or in a direction contrary thereto, or depart from the direct or customary route.

■ But, as is well illustrated by the cases cited by respondent, the situation contemplated by provisions such as those of Term or Condition 3 of the Bills of Lading, is one dealing with vessels which are accustomed to following a normal or customary route or have a fixed or established itinerary calling at certain ports in-between the point of departure and the final port of destination. This term or condition authorizes such vessels to call at such in between ports in a diffrent order, not call on them at all on their way to their final destination and call on them instead on their return trip. But this term or condition does not in any way authorize or excuse the vessel from going to the port of destination of the merchandise on board which it has contracted to carry and deliver thereto. All that it permits is that said merchandise be unloaded sooner or later, either on its way towards said port or on its return voyage.

Clearly this is not the situation here.

The S.S. Ruth Ann contracted for a voyage to Havana, Cuba, to unload and deliver the goods belonging to libelant which the respondents contracted to carry, unload and deliver there, for a prepaid freight amounting to over $100,000. The vessel was not engaged in any normal itineraried voyage with several ports of call. It had no business to do at any other ports on the way to Havana. It was on a sort of venture.

Therefore, the situations involved in most of the cases cited by respondents are inapposite to the situation involved in this action, and the only provision of the bills of lading under which respondents may seek to find some defense for their otherwise indefensible behaviour is term or Condition No. 4, quoted supra.

Of course this condition No. 4 of the bills of lading is to be read in the light of the provisions referring to "deviation" contained in the Carriage of Goods by Sea Act of April 16, 1936 (46 U.S.C.A. §§ 1300–1315,) which Act is expressly incorporated into said bills of lading by Term or Condition No. 1 thereof.

And Sec. 4(4) of said act, 46 U.S.C.A. § 1304(4) contains a proviso reading as follows:

"That if the *deviation* is *for* the purpose of loading or *unloading cargo* or passengers *it shall*, prima facie, *be regarded as unreasonable*". (Emphasis supplied.)

■ Therefore, as the court ruled from the bench on the day of the trial, respondents have the burden of proof to destroy the presumption established by said proviso of Section 4(4) of the Act (46 U.S.C.A. § 1304(4)).

■ All that respondents did, as regards their duty to overcome said presumption and thus show that the deviation of the S.S. Ruth Ann was "a reasonable deviation" was to request the court to take judicial notice that on October 20, 1960, i. e. after the S.S. Ruth Ann had left St. Johns, New Brunswick, the Department of State of the United States had proclaimed an embargo on shipments to the Republic of Cuba. (This embargo, however, did not apply to foodstuffs such as the potatoes and beans which were then on board the S.S. Ruth Ann).

The atrocities committed by Fidel Castro and his henchmen, the firing squad killings, the confiscation of valuable properties of American citizens in Cuba, particularly those of the Chase Manhattan Bank, which owns an $80,000 mortgage on the S.S. Ruth Ann, the communist influence and leanings of the Castro government, its anti-American outbursts, etc. were well known by everybody in the United States and Canada before the S.S. Ruth Ann engaged in this venture.

Respondents officers and agents who testified at the trial did not deny that they had knowlege of all these events before the Ruth Ann left St. Johns.

The Master of the vessel added that he was afraid to go to Havana, but he admitted that he was already afraid when they took the merchandise on board, although he became more afraid after he knew of the embargo, because of the repercussions this might have in Cuba and the retaliations that Castro and his men might engage in thereafter.

■ It is well settled that whatever happens after the carrier has chosen to deviate the vessel has no bearing on the determination of whether deviation was reasonable or not.

Moreover the reasonableness of the deviation is not exclusively measured by the founded or unfounded fears that the Master of the vessel or its owners might entertain.

The carrier must also show that he foresaw and considered all the relevant circumstances existing at the time, including the terms of the contract and the interests of all parties concerned so as to avoid the least inconvenience and damage in connection with the performance of the contract.

For instance, the Master and the carrier had to consider the port which was nearest to Havana, Cuba, on which the situation they were afraid of did not exist, such as Nassau, in the Bahamas, Port-Au-Prince, Haiti, Ciudad Trujillo, Dominican Republic and Kingston, Jamaica.

He was also bound to consider all such restrictions of law preventing the vessel from unloading the goods at any given port such as the provisions of the Merchant Marine Act of 1920, 46 U.S.C.A. § 883, which prohibits a foreign vessel from engaging in coastwise service, i. e. from transporting merchandise from one point in the United States (such as the beans taken on board the S.S. Ruth Ann, at Port Huron, Michigan) to another point in the United States such as San Juan, Puerto Rico, on penalty of forfeiture thereof. That respondents were familiar with and well aware of this provision of law appears from the record of this case, by the "Motion to Set Aside

Order of January 30, 1951" filed by respondent P & E Shipping Corporation on January 31, 1961, resisting the delivery to the libelant of the cargo of beans on the ground of said prohibition.

The facilities for docking, safe unloading and delivery of the cargo, quite perishable in nature, at the port to be selected, in substitution of the port of Havana, as the port of debarkation, had to be thoroughly considered and commitments therefor obtained for the purposes of a reasonable deviation.

It must be borne in mind that the Term or Condition No. 4, of the Bills of Lading, under which respondents seek to justify the deviation of the S.S. Ruth Ann to the port of San Juan, Puerto Rico, specifies that the purpose of the deviation must be to *"discharge* the goods or any part thereof there * * * and, *when landed* as hereinabove provided, * * * the *delivery* thereof by the carrier *shall be considered complete* and the Carrier, shall be freed from any further responsibility in respect thereof," etc.

Thus, it is only by a discharge of perishable goods as those involved here and their landing on a safe and appropriate dock or other adequate facilities, duly protected from the elements and free from restrictions such as those emanating from the coastwise laws, that their delivery by carrier can be considered complete to relieve the carrier from responsibility to the owner of such goods.

In the absence of a showing that the deviation was to a port where the delivery of the cargo could be made by discharge on to a safe, secure dock, suitably sheltered from the elements, free from legal obstruction or restriction such as provided by the Merchant Marine Act of 1920, a deviation cannot be held to have been reasonable. After all, this court cannot ignore the teachings of common sense, and adopt the nonsensical theory of the respondent that upon the decision of the Master to deviate, the owners of the cargo are for all practical purposes immediately divested of title to their property and that thereupon the carrier

can go far off course, nearer ports being just as safe, deliberately to a port where precisely, discharge of the cargo is by law, impossible, where the condition excusing the deviation—discharge of cargo —cannot be performed, and that such a deviation is reasonable.

In the following cases the courts have given a general view of what "the true test" in connection with the determination of what is a reasonable deviation.

American Cyanamid Co. v. Booth S.S. Co., D.C., 99 F.Supp. 232, at page 237, H.N. 8.

La Territorial de Seguros, S. P. v. Shepard Steamship Co., D.C., 124 F.Supp. 287, at pages 288, H.N. 1, 289, H.N. 3.

S.S. Willdomino v. Citro Chem. Co., 272 U.S. 718, at pages 725 and 727, 47 S.Ct. 261, at pages 262, 71 L.Ed. 491, where it was said:

"An emergency sufficient to excuse a departure cannot arise out of circumstances deliberately planned nor from gross negligence."

The evidence and the behaviour of the respondents as flowing from all the incidents and proceedings in this action strongly suggest that the deviation was deliberately planned even before the S.S. Ruth Ann departed from the port of St. Johns, New Brunswick.

As stated earlier in this memorandum, the Master and officers of the vessel of the respondent corporation who dealt with this matter and gave testimony at the trial were quite familiar with the Cuban situation. Though the S.S. Ruth Ann was mortgaged to the Chase Manhattan Bank prior to the date on which the contracts of carriage were entered into, and though they knew or must have known as of the dates they issued the four bills of lading and collected over one hundred thousand dollars for freight, that Fidel Castro's government had already confiscated the properties and business of the Chase Manhattan Bank in Cuba, and must have then had a strong premonition that Castro would also confiscate a vessel in which the Chase owned an $80,000 mortgage, this did not in any

way dissuade respondents from undertaking the venture.

It is significant that the radio operator of the S.S. Ruth Ann, on October 19, 1960 at 7:00 p. m., that is, much earlier than the release on October 20, 1960 of the U. S. Department of State Order placing an embargo on shipments to Cuba, already knew of a "probable change of destination". (See Exh. 22 Libelant).

The vessel, instead of sailing directly to Havana, started to wander around calling next at the port of New York, from there it went to Bermuda and from Bermuda it left without a definite course awaiting for further instructions as to where to go next, until it was finally directed to come to San Juan, Puerto Rico.

Libelant produced evidence showing that all Liberian vessels arriving at the port of Havana between Sept. 18 and November 25, 1960 unloaded normally at said port and left it without being confiscated or suffering any trouble whatsoever. (See Exh. 23 Libelant on Rebuttal).

Libelant also produced a list of steamers from Canadian and American ports which had come to Havana and departed from its port between October 18 and November 25, 1960. (Exh. 24 Libel. on rebuttal).

Libelant also produced a list of steamers which arrived at the port of Havana from American and Canadian ports during the period of 30 days comprised between September 18 and October 17, 1960. (Exh. 25 Libelant).

But even assuming arguendo that respondents' evidence were sufficient to establish some justifiable reason for not letting the vessel go to Havana, still the evidence overwhelmingly establishes that respondents were grossly negligent in deviating the S.S. Ruth Ann to San Juan, Puerto Rico.

As previously stated, respondents were grossly negligent in not selecting a port nearer to Havana, with ample facilities for unloading the cargo safely, under adequate cover, promptly and not subject to the coastwise restrictions covering all American ports.

They simply did not care.

They were grossly negligent in not realizing that they would breach the contract if they failed to deliver the cargo either at Havana or elsewhere.

Except for an abortive attempt to discharge the cargo to permit its attachment by *a local client of one of the proctors* for the respondent, no honest effort has been ever made by respondent to "discharge the goods" * * *—and land them, so that *"the delivery thereof* by the Carrier. * * * *be considered complete* and the Carrier (shall) be freed from any farther responsibility in respect thereof", as required by the *bills* of lading (Condition 4 quoted supra), even in cases of deviation, in order to immunize the carrier against a suit for breach of contract.

Despite the fact that the potatoes have been unloaded and removed from Puerto Rico, this was done at the request of libelant without waiving any of its rights under the bills of lading, to abate a public nuisance as all of the potatoes were rotten and spoiled. (The Court takes judicial notice of the condition of the potatoes) as to the beans, the libelant has made countless efforts to have respondent unload and deliver the same and has always met a strong resistance thereto from respondents. Even after being authorized by the Court to unload and transport the same to Havana, it has been compelled to put a $50,000 bond therefor, respondent having resisted said action by the Court and moved to have the same set aside as late as January 31, 1961.

Respondents have, therefore, failed to deliver the cargo to libelant as it is bound to do under the bills of lading.

Even if it were to be found that the deviation was reasonable, still the respondents failed to perform and have breached their contracts with libelant and are liable to the latter in the amount of *$545,619.41* value of the merchandise.

Therefore a decree in favor of libelant will be rendered.

Proctors for libelant are directed to prepare and submit proposed findings of fact, conclusions of law and form of decree within 10 days from the date of notice of this memorandum, serving copy thereof on proctors for respondents who are granted a like period to submit objections or amendments thereto.