SURRENDRA (OVERSEAS) PRIVATE,
LTD., Libellant,

v.

S.S. HELLENIC HERO, S.S. HELLENIC
SAILOR and Hellenic Lines Limited,
Respondent.

United States District Court
S. D. New York.

Jan. 10, 1963.

Burlingham     Underwood     Barron
Wright & White, New York City, for
libellant; Norman M. Barron, Charles
L. Trowbridge, New York City, of coun-
sel.

Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for respondent; James E. Freehill, Donald B. Allen, Dermot G. Foley, New York City, of counsel.

CASHIN, District Judge.

The above captioned admiralty suit concerns a shipment of heavy steel plate which was carried from New York to India in 1957. The principal controversy relates to an alleged breach by the respondent, Hellenic Lines, Limited, of a contract of carriage involving approximately 2500 long tons of libellant's steel plates which were contracted to be carried from New York on the HELLENIC HERO, a vessel of the respondent, for discharge and delivery at the port of Vizagapatam, India. The first cause of action is to recover the cost of transporting the steel plates from Madras, India, to Vizagapatam after the cargo was discharged by the HELLENIC HERO at the port of Madras rather than at the agreed port of Vizagapatam.

There is also a second cause of action which relates to 40 of libellant's steel plates, which arrived too late to go forward on the HELLENIC HERO and were placed on the following ship, the HELLENIC SAILOR, also owned by respondent Hellenic Lines Limited.

This court has jurisdiction of the libellant and respondent *in personam*, of the steamships HELLENIC HERO and HELLENIC SAILOR *in rem*, and of the subject matter of this cause in admiralty pursuant to Article III, § 2 of the Constitution and 28 U.S.C. § 1333.

Libellant, Surrendra (Overseas) Private, Ltd., is a limited liability corporation organized under the laws of India, with its principal office in Calcutta, India. In 1957 libellant purchased about 6000 tons of steel shipbuilding plate for resale to the Government of India under a contract calling for delivery at the Hindustan shipyard wharf in Vizagapatam, India. Vizagapatam (also spelled "Vizagapatnam" or "Vizakhapatnam") is a small port on the East Coast of India, and is commonly known as "Vizag". The latter abbreviated name will hereinafter sometimes be used when referring to this port.

Respondent, Hellenic Lines Limited, is a steamship operator engaged in the common carriage of merchandise by water for hire, and at all material times was the owner and operator of the SS HELLENIC HERO and SS HELLENIC SAILOR.

On or about July 8, 1957, by oral booking confirmed the next day by a written freight engagement, and thereafter supplanted by short form Bills of Lading issued on August 2, 1957, respondent agreed to transport approximately 2500 tons of libellant's steel shipbuilding plates from New York to Vizag and deliver them there in consideration of freight at the applicable Conference rate of $35.50 per long ton.

Before booking the shipment of libellant's plates to Vizag with Hellenic Lines Limited, libellant's agent had approached other shipping lines for a Vizag booking, but with completely negative results.

The main commercial object of the transaction was the transportation of libellant's steel plates to Vizag. The agreed freight rate of $35.50 per long ton charged by respondent was the standard contract rate charged by members of the India, Pakistan, Ceylon and Burma Outward Freight Conference for steel plate intended to be shipped from New York to Vizag. The total freight which respondent was paid amounted to $87,755.99, consisting of the Karachi-Bombay-Calcutta "base port" rate of $31.50 per long ton plus a $4.00 "differential" charge per long ton assessed because of Vizag's status as an "outport". The bills of lading specified:—"PORT OF DISCHARGE FROM SHIP VISAKHAPATNAM."

During the months of July and August, 1957 it was common knowledge in the United States-India trade that vessels discharging at all Indian ports, including Vizag, were experiencing heavy delays due to congestion and unavailability of berths. Thus, respondent knew or should have known when it undertook to carry libellant's steel plates that

serious delays were likely to be encountered in discharging them at Vizag.

On July 26, 1957 American Union Transport, Inc., the New York agent for libellant, applied on its behalf to the India, Pakistan, Ceylon and Burma Outward Freight Conference for a waiver of the $4.00 per long ton differential "outport" charge, on the ground that the quantity being shipped was sufficiently large to make Vizag a "base port" for the particular voyage. This application was rejected on July 31, 1957 by the Conference, after consultation with respondent. The letter of rejection, dated July 31, 1957, from the Conference Secretary to the libellant's New York agents, stated:—

"At the present time, conditions at all Indian ports including Vizagapatam have deteriorated to such an extent that the vessels are subject to extraordinary delays and if a Direct Call is to be made at Vizagapatam in order to accommodate your cargo, it must be expected that delays will ensue which are extremely costly to the carrier."

The SS HELLENIC HERO sailed from New York on August 3, 1957, on its maiden voyage, with 2472 tons of libellant's steel plates on board. This quantity was more than the total cargo on board destined for any other individual port and represented about 40% of all the cargo on the ship.

Mindful of the reason given for the rejection of its application for a waiver of the $4.00 differential, the libellant instructed its New York agent to contact the respondent to find out what freight reduction respondent would allow if libellant expedited the discharge of the plates at Vizag by taking overside delivery into lighters. On September 17, while the SS HELLENIC HERO was en route to Vizag, this request was communicated to respondent, but respondent refused to grant any such reduction. At the time it rejected this proposal, respondent had already instructed its agents at Vizag, F. W. Heilgers & Co.,

Ltd., to have the libellant's plates deposited in lighters if a berth for discharging them was not immediately available at Vizag, and to refuse to deliver the plates to the receivers until they paid further freight for the lighters. On September 24, 1957 respondent directed its agents to hire "IF NECESSARY ANY-KIND CRAFT WHATSOEVER AT ANY RATE FOR RECEIVERS ACCOUNT FOR DISCHARGING."

After stopping to load and/or discharge at Port Said, Port Sudan, Djibouti, Karachi, Bombay, Colombo, and Madras, the HELLENIC HERO arrived at Vizag on September 26, 1957. Libellant's 2472 long tons of plates then represented over 60% of the cargo on board. Respondent at that time was also under a commitment to load at Vizag, for another shipper, 2500 long tons of manganese ore.

When the HELLENIC HERO arrived on September 26, 1957, it found that the port of Vizag was heavily congested, with all the berths occupied. The HELLENIC HERO was assigned to discharge, in turn, at the Hindustan Shipyard jetty, where such steel plates were customarily discharged. The HELLENIC HERO's place in line was after the STATE OF WEST BENGAL, which was then discharging similar cargo at that berth.

The HELLENIC HERO remained at anchor a few miles from the Hindustan Shipyard berth from September 26 to October 5, 1957. After the arrival of the HELLENIC HERO, efforts were made by respondent's agents to discharge the cargo at Vizag by hiring lighters; by hiring a ship then undergoing repairs to serve as a floating warehouse; and by having the shipyard workers speed up the discharge of the STATE OF WEST BENGAL. These efforts were, however, unsuccessful.

On September 28 respondent received a cable from its agents in Vizag that, as a result of difficulties at the berth, the STATE OF WEST BENGAL was then discharging at an average daily rate of

100 tons per day, and that consequently the HELLENIC HERO could at that rate be expected to berth on October 20 at the earliest.

On September 29, respondent, without consulting libellant or its representatives, cabled its Vizag agents to have the HELLENIC HERO proceed "immediately" either to Madras or Calcutta, both base ports, to discharge libellant's cargo. On October 2, 1957 respondent again cabled its Vizag agents, directing them to have the SS HELLENIC HERO divert to Madras. On October 4, 1957 at 2:10 P. M., Vizag time, the respondent's agents at Calcutta advised the Master of the HELLENIC HERO to proceed "immediately" to Madras to discharge libellant's cargo. At that time, although the libellant had been notified of the impending arrival of the HELLENIC HERO at Vizag on September 13, 16, 18 and 25, and of its actual arrival on September 26, neither the libellant nor its agents, nor the receiver of the cargo had been advised of respondent's intentions or in any way consulted concerning the intended deviation.

Libellant's agents were not advised of respondent's intentions to deviate until October 5, when respondent's agents advised libellant's clearing agents—

"Owing to lack of facilities here to discharge Shipyard Plates, we have diverted the above vessel to Madras under instructions from our Calcutta Principals to discharge cargo consigned to Vizagapatam which please note."

Although the HELLENIC HERO had made a stop at the port of Madras on September 24–25, and had been scheduled to proceed from Vizag to Calcutta, she returned to Madras on October 5. After the deviation, libellant's 2472 long tons of steel plates were thereafter discharged by respondent at Madras, some 500 miles away from Vizag, where respondent left them, refusing all further responsibility. As a result, libellant was required to pay the transportation and other expenses involved in moving the steel plates to Vizag, and respondent has refused to reimburse these sums.

During the discharge at Madras on October 6–13, respondent also loaded approximately 500 tons of ore at that port.

On October 17 the STATE OF WEST BENGAL completed discharging at the Hindustan Shipyard in Vizag. Thus, if the HELLENIC HERO, rather than deviating to Madras, had waited twelve days longer at Vizag, as other ships were doing, the HELLENIC HERO could have gained the Hindustan Shipyard jetty berth and commenced discharging.

The Government of India was the purchaser and receiver of libellant's plates, the owner of the berth at the Hindustan Shipyard jetty and of the STATE OF WEST BENGAL, the vessel which had beaten out the HELLENIC HERO for that berth. The Government of India was also the owner of the Bhilai steel project in connection with which the available lighters in the port of Vizag were being employed in September and October 1957. There is credible evidence that if the libellant had been given reasonable warning of respondent's intentions to deviate, libellant, as contracting supplier to the Government of India, would likely have been able to arrange for lighters or a berth for the discharge of its plates on a priority basis at Vizag.

It is respondent's contention that its deviation from Vizag to Madras was specifically permitted in the bill of lading contracts covering the shipment. Clause 5 of respondent's long form bill of lading, the terms of which were incorporated by the short form, contained the following language:—

"5. * * * Without limitation of any other provision herein, in any situation whatever or wherever occurring and whether existing or anticipated before commencement of, or during the voyage, which, in the judgment of the carrier is likely to give rise to * * * detention, * * * delay or disadvantage to * * * the ship * * * or to give rise to delay * * *

in * * * discharging at or leaving the port of discharge or the usual or intended place of discharge in such port, * * * the carrier, whether or not proceeding toward or attempting to enter the port of discharge, * * * may proceed * * * to or stop at such other port or place whatever as the carrier may consider safe or advisable under the circumstances * * * and discharge the goods at any place he may select there * * * The carrier is not required to give notice of discharge or forwarding. Whenever the goods are discharged from the ship they shall be at their own risk and expense. Such discharge shall constitute complete delivery and performance under this contract and the carrier shall be free from any further responsibility. The carrier shall be entitled to a reasonable extra compensation for any services in connection with the foregoing above the agreed freight."

■ Libellant argues, however, that the liberties clause set forth in Clause 5 is not applicable by its terms to the overcarriage beyond the agreed port of destination here involved. Libellant asserts that since the overcarriage to Madras did not occur "whether or not proceeding toward or attempting to enter the port of discharge", but after leaving it, the respondent's action is therefore not within the powers which Clause 5 purports to confer upon it. Such an interpretation of Clause 5 seems to me to place undue emphasis on only one portion of the liberties clause. A fair reading of that phrase in its context convinces me that the words "whether or not proceeding toward or attempting to enter the port of discharge" were not intended to exclude a situation in which the delay was encountered when the vessel has actually entered the port of discharge. Thus, I find that Clause 5 was applicable to the situation herein presented. Nevertheless, the respondent is entitled to the protection afforded it by Clause 5 only if, in its deviating from

Vizag to Madras, respondent acted reasonably under all the circumstances.

■■ The fundamental obligation of a common carrier is, of course, to deliver the cargo to the port of destination set forth in the bill of lading, and not to some other place unilaterally selected by it. The Poznan, 276 F. 418, 424 (SDNY 1921); Fadex Chemical Corp. v. Lorentzen, Mun.Ct., 44 N.Y.S.2d 789, 1944 A. M.C. 940, 941. See also The Ruth Ann, 192 F.Supp. 607 (D.Puerto Rico 1961). Overcarriage beyond the agreed port of destination is a deviation. Fadex Chemical Corp. v. Lorentzen, supra.

■■ The steel plates in the instant case were, by the terms of the bill of lading and by the explicit terms of 46 U.S.C. § 1300, transported subject to the provisions of the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq. Consequently, the bill of lading must be read in the light of the above Act. Section 4 (4) of the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(4), reads as follows:—

"(4) Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable."

Since the only purpose of the deviation of the HELLENIC HERO to Madras was to load or unload cargo, the respondent's conduct is, by virtue of the proviso of § 1304(4), prima facie unreasonable, and respondent has the burden of overcoming that presumption. The Ruth Ann, 192 F.Supp. at 612; Haroco Co., Inc. v. M/V Tai Shan, 111 F.Supp. 638, 1953 A.M.C. 887 (S.D.N.Y.1953).

■ The propriety of any particular deviation from the route of a vessel's contractual voyage is a question of fact in each case. It is a question of inherent

reasonableness which depends on all the surrounding circumstances. The San Giuseppe, 122 F.2d 579 (4 Cir., 1941); W. R. Grace & Co. v. Toyo Kisen Kabushiki Kaisha, 7 F.2d 889 (N.D.Cal.1925). I conclude that respondent has failed to show that its deviation to Madras was a "reasonable deviation" under the circumstances of the instant case, and, as such, has failed to sustain the burden imposed upon it by the proviso of § 1304 (4).

Respondent claims that it deviated in order to accommodate other cargo interests in other ports and lays great emphasis on the claim that its actions were rendered reasonable by virtue of its operation of a "regular liner service." Its claim of being a "regular liner service" is weakened by considerable evidence which shows that the respondent's "liner service" was, to say the least, highly flexible and irregular, with respondent reshuffling the HELLENIC HERO and its other vessels in the Indian area regardless of schedule. But, even assuming that the HELLENIC HERO was in regular liner service, the respondent has in any event utterly failed to show that the deviation was reasonably necessary in order to accommodate its obligations to other cargo interests.

On board the HELLENIC HERO at the time of the deviation were 989 and 165 long tons of cargo destined for Calcutta and Chittagong, respectively, the only two remaining ports on the outbound voyage. But the respondent made no showing that there was any urgency whatsoever concerning the time of HELLENIC HERO's arrival at the latter ports which in any way influenced its decision to deviate. The HELLENIC HERO never did stop at Chittagong at all but, instead, discharged the Chittagong cargo at Calcutta. When respondent decided to discharge the Chittagong cargo at Calcutta, respondent made previous arrangements for such with the Chittagong consignees, and then transshipped their cargo to Chittagong. No such care was taken prior to the deviation to Madras of libellant's much larger shipment.

Under all the circumstances of this case I must conclude that the deviation to Madras without notice to libellant, and without transshipping libellant's plates from Madras to Vizag, was unreasonable. In the light of § 1304 (4), I am compelled to reach the above conclusion because any other would allow a carrier to deviate without liability and thwart the entire commercial purpose of the transaction although it has been unable to show any factors which would render its decision to deviate reasonable.

Nor can the respondent justify its deviation on the ground of the congestion at the port of Vizag, especially since such congestion and delay were expectable at the onset of the venture. See The Poznan, 276 F. 418, 425. Respondent, when it booked the libellant's cargo had a good idea of what risks it was likely to encounter in discharging the cargo at Vizag. It took a gamble for the $87,-755.99 in freight that conditions would improve, and it lost.

I now come to libellant's second cause of action. This cause of action relates to 40 of libellant's shipbuilding plates which arrived at Berth 1, Port Newark, too late to be loaded on board the HELLENIC HERO, and which were subsequently loaded on board the HELLENIC SAILOR instead. After some controversy about the freight to be paid, respondent issued two bills of lading under date of August 9, 1957, providing for discharge of these plates at Vizag, via Bombay, and further providing that the plates were to be transshipped at Bombay for Vizag "at ship's expense." The HELLENIC SAILOR discharged the plates at Bombay and forwarded them to Vizag on board the S.S. JAG VIJAY. Upon arrival of the plates at Vizag, however, respondent's agents required libellant to pay the transshipment expenses as a condition of receiving the cargo. Libellant paid under protest and sues to recover the amount of this payment. I find that the respondent's action was in

violation of the explicit bill of lading provision, and respondent is liable to libellant for the transshipment expenses which libellant was required to pay to obtain delivery.

The foregoing shall constitute my Findings of Fact and Conclusions of Law.

An interlocutory decree may be settled granting judgment in favor of libellant on both causes of action, with costs, and referring the issue of damages to a Commissioner.