**INTERNATIONAL DRILLING COM-PANY, N. V.,**

v.

**The M/V DORIEFS, in rem,**
Compania Naviera "Doriefs", S. A., Marlin International Corporation, Commerce Marine Line, Inc., Lacy & Company, Inc., and J. M. Cook Company, in personam.

**No. 64–H–171.**

United States District Court
S. D. Texas,
Houston Division.
Oct. 15, 1968.

Vinson, Elkins, Weems & Searls, Robert M. Julian, Houston, Tex., for plaintiff, International Drilling Co.

Royston, Rayzor & Cook, George W. Renaudin, Houston, Tex., for defendant "Doriefs" S. A.

Schlanger, Cook & Cohn, Joel W. Cook, Houston, Tex., for defendant J. M. Cook Co.

## MEMORANDUM OPINION

SEALS, District Judge.

This is a proceeding in admiralty by International Drilling Company (IDC) against the M/V DORIEFS, *in rem,* her owner, Compania Naviera "Doriefs", S. A. (owner) and Marlin International Corporation (Marlin) for breach of a contract of affreightment and damages resulting from delay in the delivery of cargo. The libel also seeks to hold Lacy & Company (Lacy) and J. M. Cook Company (Cook) responsible for their alleged activities in the inducement of, or their participation in, the breach of contract.

After suit was filed in this court in October, 1964, and answers were filed jointly by Marlin, Lacy and Cook through a local attorney, Marlin filed a petition in bankruptcy in the United States District Court for the Southern District of New York. Counsel for these parties

was notified that his services were no longer required and the court allowed him to withdraw from this case. Although copies of the proceedings were mailed to both Marlin and Lacy, they have failed to make further appearance before this court. Cook subsequently retained another attorney to represent him in these proceedings.

▪ There is no indication that there has been any action taken that would preclude this court from exercising its admiralty jurisdiction over, and proceeding to judgment against either Marlin or Lacy. Accordingly, it is the opinion of this court that there is full and complete jurisdiction of the subject matter and parties herein, including jurisdiction *in rem* of the M/V DORIEFS.

In March, 1964, Marlin through its agent Lacy, contracted with Global Supply, Incorporated to transport a drilling rig from Houston, Texas to Marsa El Brega, Libya. The rig was to be loaded between the first and tenth of May with an expected transit time of seventeen days to destination. It appears that it was agreed, or at least Global expected that Marsa El Brega would be the first port of call.

In April, 1964, Behring-Southports Shipping, Incorporated, as agent for the Offshore Company and its subsidiaries, IDC and Offshore Venezuela, C.A., entered into negotiations with Lacy and Cook, Marlin's agents in New Orleans and Houston, to arrange for the shipment of a drilling rig from Houston to Benghazi, Libya. These negotiations culminated in an agreement dated April 14, 1964, between Marlin and Offshore Venezuela. The agreement was executed by the agents after approval by the Offshore Company and its subsidiaries. Among other things, the agreement guaranteed the arrival of the rig in Benghazi within twenty-one days after departure from Houston, subject to conditions and circumstances beyond Marlin's control, and that Benghazi would be the first port of discharge. The agreement was also made "subject and subordinate to all terms and conditions of Marlin International Corporation's regular liner form bill of lading."

On April 23, 1964, Marlin chartered the M/V DORIEFS from its owner under a time charter (Government Form—New York Produce Exchange) in London. The DORIEFS was delivered to Marlin pursuant to the charter party at Tampa, Florida on or about April 30, 1964, where she was partially loaded with bulk cargo to be delivered at Savona, Italy. There the master of the DORIEFS delegated to Marlin and its agents authorization to execute bills of lading in his name. Thereafter, the vessel sailed for Houston, arriving on May 5th.

While in Houston, both drilling rigs were loaded aboard the DORIEFS along with general cargo destined for Alicante, Spain. On May 13th, Behring-Southports prepared a bill of lading listing IDC as the shipper and consignee of the rig bound for Benghazi. The bill of lading forms were supplied by Cook and he signed the prepared forms for the master of the DORIEFS.

The same day the DORIEFS departed Houston, arriving at New York on May 19th. After loading general cargo to be delivered in Alexandria, Egypt the vessel sailed for Alicante arriving there on May 31st. The vessel then proceeded to Alexandria, arriving on June 6th; Marsa El Brega, arriving on June 9th; and Benghazi, arriving on June 14, 1964, some eleven days later than anticipated in the agreement of April 14, 1964.

IDC claims that the routing provisions of its contract of affreightment were breached in that: (1) the DORIEFS did not make Benghazi its first port of discharge; (2) the vessel did not arrive at Benghazi within twenty-one days of its departure from Houston; and (3) the vessel deviated from its voyage by proceeding from Houston to New York, then to Alicante, then past Benghazi to Alexandria before doubling back to Marsa El Brega and Benghazi. As a result, it is contended that IDC sustained damages for the expense of maintaining a crew and logistic equipment in prepara-

tion of receiving the rig and moving it inland while awaiting the delayed arrival of the DORIEFS. It is also urged that some discharging costs for the vessel's account were not defrayed by Marlin or the vessel, but were advanced by IDC to obtain its cargo.

It is the opinion of this court that IDC was the owner and true party in interest in the drilling rig in question. Although it appears that Offshore Venezuela was the original owner, the purchasing agent for the Offshore Company and its subsidiaries testified that at all times pertinent to this action IDC was the owner. The bill of lading shows IDC to be both shipper and consignee of the cargo.

The foremost controversy in this case centers around the question of what constitutes the contract of affreightment and, once that issue is resolved, who, if anyone, is liable in damages to IDC. The evidence indicates that from the time of the first negotiations until the actual delivery of the rig at Benghazi, the date of such delivery was of paramount importance to IDC. In accepting the letter agreement of April 14th, Marlin bound itself to deliver the rig within twenty-one days of departure from Houston and to insure this, designated Benghazi as the first port of discharge. It is apparent from the evidence that this was the primary reason IDC permitted Marlin to transport the cargo. The evidence further demonstrates that Marlin directly and through its agents continued to reassure IDC's agents that the specified date of delivery would be met while the rig was being loaded aboard the DORIEFS and after the vessel sailed from Houston. As the charterer of the vessel Marlin directed its course at all times by instructions to the master. Whatever the reasons that prompted Marlin to choose this particular route for the DORIEFS (although the evidence suggests that it was for Marlin's own economic interests), it is the opinion of this court that in so doing Marlin breached the agreement of April 14th and that breach resulted in damages to IDC.

Although the bill of lading was silent as to the terms of the April 14th agreement and that agreement was made subject to the bill of lading, the bill of lading standing alone cannot be considered as a complete defense to the charterer as was the case in American Tobacco Co. v. The Katingo Hadjipatera, 81 F.Supp. 438, 447–448 (S.D.N.Y.1948); modified, 194 F.2d 449 (2d Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952). Unlike the facts of that case, the bill of lading herein shows that it was prepared after the cargo was on board the DORIEFS and presumably out of the control of the shipper. In addition, as previously mentioned, the charterer repeatedly assured the shipper that the delivery provisions of the prior agreement would be honored.

Where, as here, the facts of a particular situation justify it, the conditions and circumstances known to the parties and contemplated by them in the making of a bill of lading will be taken into consideration in giving effect to the bill of lading. Isthmian S. S. Co. v. California Spray-Chem. Corp., 300 F.2d 41, 44 (9th Cir. 1962); W. R. Grace & Co. v. Frank Waterhouse & Co., Inc., 264 F. 422, 424 (9th Cir. 1920); Pacific Coast Co. v. Yukon Independent Transp. Co., 155 F. 29 (9th Cir. 1907). Under these circumstances it is unnecessary to hold that the prior agreement replaced the bill of lading or that the bill of lading was merely a receipt for cargo loaded in order to give full effect to the provisions of the April 14th agreement. Toyo Kisen Kaisha v. W. R. Grace & Co., 53 F.2d 740 (9th Cir. 1931). Accordingly, Marlin as the charterer of the vessel, must be held accountable to IDC for its breach of the prior agreement in that the rig was not delivered within twenty-one days transit time from Houston and Benghazi was not made the first port of discharge.

It does not follow by this reasoning that the DORIEFS and its owner are liable to IDC for Marlin's breach of the prior agreement. Only Marlin and IDC

were parties to that agreement which was entered into some nine days before the DORIEFS was chartered. There is no evidence that the master or owner of the vessel at any time had knowledge of the terms of that agreement. The agreement was made subject to the bill of lading. The bill of lading signed by Cook for the master pursuant to Clause 8 of the charter party contained no reference to the agreement of April 14th, the proposed first port of discharge or a transit time of twenty-one days.

■ In *The Blandon,* Judge Learned Hand summarized the law applicable to this situation: "[W]hen the master weighed anchor, he must be held to have accepted any bills of lading outstanding made in his name, not any contracts of carriage made by the charterer personally. The bill of lading remained the only ship's contract as well after as before it was ratified." 287 F. 722, 727 (D.C.S. D.N.Y. 1922).

The Court of Appeals for the Fifth Circuit reached the same conclusion in United States Shipping Board Emergency Fleet Corp. v. Pensacola Lumber & Timber Co., 290 F. 358 (5th Cir. 1923). In that case the agent of the Shipping Board entered into a booking agreement with the shipper before a vessel has been assigned to him. The agreement provided that it would be subject to the bill of lading of the vessel assigned. A ship was delivered for loading more than a month after the time designated in the booking agreement and the shipper subsequently sued the Shipping Board for damages resulting from the delayed delivery. The court held that since the Shipping Board was not aware of the contract between the agent and the shipper, the provisions of the bill of lading determined the ship's duties to the cargo interests.[1] See also The Caledonia, 43 F. 681 (C.C.Mass. 1890), aff'd 157

U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644 (1895).

Also in point is Instituto Cubano De Estabilizacion Del Azucar v. T/V Golden West, 246 F.2d 802 (2d Cir. 1957) cert. denied, 355 U.S. 884, 78 S.Ct. 152, 2 L.Ed.2d 114 (1957). There the owner chartered the vessel to Overseas Commodix, who in turn chartered to Transocean. Transocean hired out the vessel to Azucar to carry molasses. The bills of lading for the molasses cargos contained clauses providing that the cargo was carried under the terms of the charter for hire between Transocean and Azucar which contained a provision for arbitration in the event of disputes. In an action to compel the owner of the vessel to submit to arbitration certain claims for shortage, the court held that although the ship and owner became liable for a failure to perform under the bills of lading, once they were signed by the master, the owner was not a party to the charter (containing the arbitration clause), incorporated into the bills of lading and could not be compelled to submit to arbitration. See also Universal American Corp. v. S.S. Hoegh Drake, 264 F.Supp. 747 (S.D.N.Y.1966).

On close examination of those cases cited by IDC for the proposition that the vessel may be held responsible for prior contracts made by the charterer, the court is convinced that they are authority only for the proposition that the vessel is bound by the terms of the bill of lading. Therefore, in light of the above opinions this court holds that neither the vessel nor its owner is bound by agreements made by the time charterer prior to the chartering of the vessel where, as here, it is evident that the owner or master at no time had knowledge of the prior agreement or the terms thereof.

1. Normally a vessel is bound solely by the terms of the bill of lading and cargo interests may not alter such terms as are contained therein by the use of parol evidence. The Delaware, 14 Wall. 579,

81 U.S. 579, 20 L.Ed. 779 (1872); The Pelotas, 66 F.2d 75, 78 (5th Cir. 1933); The Sidonian, 34 F. 805, 806 (D.C.E.D.N. Y.1888), aff'd, 35 F. 534 (C.C.E.D.N.Y. 1888).

■ The court does not accept IDC's contention that the DORIEFS sailed without a true bill of lading having been signed. Although it appears that the bill of lading was prepared on a Commerce Marine Line form rather than on Marlin's form, the evidence shows that the two were identical except for the heading. The form is that of a standard ocean bill of lading. The bill of lading form designated the DORIEFS as the carrying ship. Both IDC and its agent Behring-Southports (who prepared the bill of lading) knew the DORIEFS was the designated vessel, that Marlin was the charterer and that Cook was signing bills of lading on behalf of Marlin for the master of the vessel. The bill of lading was not negotiable. There is no evidence that IDC or Behring-Southports at any time objected to the forms supplied by Cook. Under these circumstances IDC cannot now complain of an error in the form of the bill of lading that in no way changed the content thereof. The Laurent Meeus, 133 F.2d 552, 557 (9th Cir. 1942); cert. denied, 318 U.S. 781, 63 S.Ct. 858, 87 L.Ed. 1148 (1943). The contrary holding in Petition of Isbrandtsen Co., Inc. is inapplicable where, as in this case, the content of the bill of lading forms is identical. 105 F.Supp. 353, 369 (S.D.N.Y.1952, modified, 201 F.2d 281 (2d Cir. 1953).

■ IDC bases its claim against Cook and Lacy on the allegation that they were aware that the DORIEFS would be unable to make both Marsa El Brega and Benghazi its first port of call, and in spite of this arranged for and participated in the loading of the two drilling rigs on board the vessel, concealing such knowledge from IDC. It is also contended that "they either induced, conspired or participated in causing a breach of libelant's contract". The court concludes that the evidence does not support these allegations. Lacy appears to have been the general cargo agent for Marlin that arranged for the shipments of the two drilling rigs. Cook participated to a limited extent in arranging for the shipment of the IDC rig and acted as the ship's agent in the Port of Houston. At all times both Lacy and Cook in their dealings with IDC and Behring-Southports acted as agents for their disclosed principal Marlin. The court finds that neither Lacy nor Cook were parties to the April 14th agreement. As discussed previously, when Cook signed the bill of lading on May 13th, it was clear to all parties that he did so in the capacity as agent for Marlin and bound only his principal thereto. Strachan Shipping Co. v. Alexander Eccles & Co., 25 F.2d 361 (5th Cir. 1928), cert. denied, 278 U.S. 610, 49 S.Ct. 13, 73 L.Ed. 535 (1928). As previously noted the bill of lading made no mention of the terms of the April 14th agreement.

Although it appears that both agents knew that the two rigs were to be loaded on board the DORIEFS and in fact Lacy made the comment to his principal that Marlin would probably want to transport both rigs on that vessel, it is clear that Behring-Southports at the time of loading became aware of the loading plans and raised the question as to whether this would prevent the unloading of the IDC rig at Benghazi before the discharge of the Global rig at Marsa El Brega. Lacy and Cook contacted Marlin in this regard and were assured by Marlin that Benghazi would be the first port of discharge.

■ About three days prior to the departure of the DORIEFS from Houston, Marlin advised Cook that the vessel would proceed to New York for bunkers. This information was not relayed to Behring-Southports or to IDC, but the routing of the DORIEFS to New York was not a breach of the April 14th agreement. That contract only assured IDC that Benghazi would be the first port of discharge and that delivery would be within twenty-one days from the vessel's departure from Houston.

Although the evidence, either direct or by the circumstances, does not indicate at what point in time Marlin decided to breach the April 14th contract, this court is of the opinion that it has not

been proved that Lacy or Cook were aware that the vessel would not arrive at Benghazi as anticipated. The master's oath, filed with the Bureau of Customs after the vessel's departure from Houston, did not include Alexandria as a port of call, and there was no cargo on board destined for that port at that time. The vessel departed Alicante on June 1st and had it proceeded directly to Benghazi would have probably arrived by June 4th, only one day later than the time contemplated in the April 14th agreement. The evidence does not indicate that either Lacy or Cook had any control over the route of the vessel.

■■■■ "An authorized agent is not liable for breach of a contract which it makes on behalf of the principal, except where the agency is concealed, or where it is contracting as ostensible principal." Mallory S.S. Co. v. Garfield, 10 F.2d 664, 666 (2d Cir. 1926), cert. denied, 273 U.S. 703, 47 S.Ct. 97, 71 L.Ed. 848 (1926). Although an agent may be liable to third parties for his misfeasance and positive wrongs, he is not liable for nonfeasances or mere neglect in the performance of duty except to his principal. Id. at 667. Accordingly, this court is of the opinion that neither Lacy nor Cook is liable to IDC for its damages.

IDC's alternative contention is that the route taken by the DORIEFS at the instruction of the charterer constituted a deviation from the proposed voyage which deprived the vessel of exceptions in the bill of lading otherwise permissible under the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq. The Willdomino v. Citro Chemical Co. of America, 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491 (1927); P & E Shipping Corp. v. Cubana Export & Importadora De Alimentos, 335 F.2d 678 (1st Cir. 1964). Thus, it is argued, the vessel is liable *in rem* and the ship owner *in personam* to IDC for the damages resulting from the delayed arrival of the vessel at Benghazi.

■■■ A careful review of the authorities convinces this court that the doctrine of deviation should not be applied in cases where there has been no loss or physical damage to the cargo. In this instance, IDC's damages were the result of expenses incurred in maintaining a crew and equipment at Benghazi for some eleven days in order to move the rig inland. There was no loss or damage to the cargo itself.

The concept of deviation originated in marine insurance policies. Cargo insurance was not enforceable where the vessel without excuse departed from or delayed unreasonably in pursuing the planned voyage. The accepted view came to be that deviation ousted the contract of carriage embodied in the bills of lading and made the carrier an insurer of cargo for damages sustained during or after the deviation. Cogsa modified, and possibly eliminated this feature of deviation, substituting instead a liability for damages actually caused by the deviation. Gilmore & Black, The Law of Admiralty, §§ 3–40, 156 (1957).

■■■ What is important to this discussion is that the concept of deviation implies that the vessel's deviation causes an additional risk of loss or damage to the cargo not contemplated by the shipper. Thus, even though there may be a departure by the vessel from its normal course or voyage, where there is no loss resulting from an increased peril, the doctrine should not be applicable.

To deviate, lexicographically, means to stray, to wander. As applied in admiralty law, the term "deviation" was originally and generally employed to express the wandering or straying of a vessel from the customary course of the voyage, but in the course of time it has come to mean any variation in the conduct of a ship in the carriage of goods *whereby the risk incident to the shipment will be increased,* such as carrying the cargo on the deck of the ship contrary to custom and without the consent of the shipper, delay in carrying the goods, failure to deliver the goods at the port named in the bill of lading and carrying them farther to another port, or bringing them back

to the port of original shipment and reshipping them. Such conduct has been held to be a departure from the course of agreed transit and to constitute a "deviation" *whereby the goods have been subject to greater risks, and, when lost or damaged in consequence thereof, clauses of exceptions in bills of lading limiting liability cease to apply.* Citta Di Messina (D.C.) 169 F. 472; The Indrapura (D.C.) 171 F. 929; The Sarnia (C.C.A.) 278 F. 459; Niles-Bement-Pond Co. v. Dampkiesaktieselskabet Balto (C.C.A.) 282 F. 235; Calderon v. Atlas S.S. Co., 170 U.S. 272, 18 S.Ct. 588, 42 L.Ed. 1033; St. Johns N. F. Shipping Corporation v. S. A. Companhia Geral, etc., 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201; Guerger v. Cunard Steam-Ship Co., Limited, 25 Lloyds List L.R. 215. G. W. Sheldon & Co. v. Hamburg Amerikanische Packetfahrt-Actien-Gesellschaft, et al., 28 F.2d 249, 251 (3rd Cir. 1928) (emphasis added).

█ Deviation has been defined by the Fifth Circuit Court of Appeals as meaning "any departure from the terms of the contract of carriage, in the course of the voyage, from which loss or damage to cargo results." Smith, Kirkpatrick & Co. v. Colombian S. S. Co., Inc., et al., 88 F.2d 392, 394 (5th Cir. 1937).

The court realizes that the recent case of Surrendra (Overseas) Private, Ltd. v. S. S. Hellenic Hero, et al held that the carrier was liable to the shipper for transshipment costs under the deviation doctrine where cargo was overcarried to a port other than that named in the bill of lading. 213 F.Supp. 97 (S.D.N.Y. 1963), aff'd, 324 F.2d 955 (2d Cir. 1963). The opinion indicates that the court felt any other conclusion would thwart the entire commercial purpose of the transaction. 213 F.Supp. 97, 102. It does not appear that the court considered the effect of 46 U.S.C.A. § 1303 which provides that the carrier is under the duty to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." As noted

in the commentary of Gilmore & Black, "[t]hat duty, by the terms of the Act, overrides every phase of the performance of the contract of carriage." §§ 3-41, 161.

At any rate the holding in the *Hellenic Hero* is limited to an overcarriage of cargo resulting from the vessel's deviation. That is not the situation in this case. The basis for this action was the delayed arrival of the drilling rig at Benghazi. It should be noted that IDC's damages resulted primarily from Marlin's breach of the April 14th agreement. The crew and equipment were assembled at Benghazi in reliance on that contract, not on the bill of lading which was silent as to time of arrival of the cargo.

In refusing to apply deviation as a defense in an action by the carrier against the shipper for demurrage charges, the court in St. Ioannis Shipping Corp. v. Zidell Explorations, Inc., stated, "the doctrine [of deviation] has been applied only in cases where the goods were damaged. What remains of the doctrine should be applied in those cases only." 222 F.Supp. 299, 302 (Ore. 1963), aff'd, 336 F.2d 194 (9th Cir. 1964). Under the circumstances of this case this court is of the same opinion. See Gilmore & Black, §§ 3-42, 161-162 (1957). In light of this holding there is no need to determine whether in fact a deviation occurred.

█ Finally, the court comes to the contention that the vessel and its owner should be required to reimburse IDC for certain discharging costs incurred by the shipper at the port of Benghazi in order to obtain its cargo. The court is of the opinion that IDC has adequately and timely plead and proved that certain expenses were incurred in the discharging of the rig from vessel and that the ship and its owner should be liable therefor.

█ Clearly, in the absence of a contract or of a custom binding upon the parties to the contrary, it is as much the

488

duty of the shipowner to load and discharge the cargo as to carry it between the loading and discharging ports. This duty applies to time chartered vessels such as is the case here. Munson S. S. Line v. Glasgow Nav. Co., 235 F. 64 (2d Cir. 1916), cert. denied 243 U.S. 643, 37 S.Ct. 405, 61 L.Ed. 944 (1917), appeal dismissed 246 U.S. 647, 38 S.Ct. 315, 62 L.Ed. 916 (1918); Mondella v. The S. S. Elie V, et al, 223 F.Supp. 390 (S.D. N.Y. 1963). As in the *Munson S. S. Line* case, the charter party here contains the provision that the charterer is to discharge the cargo at his expense. "This obligation to pay for the unloading does not make the unloading the duty of the charterer, and leaves the legal duty of loading and discharging upon the owner, just as the duty of navigation remained upon the owner, although it was being performed by a supercargo appointed and paid by the charterer. The Volund, 181 Fed. 643, 104 C.C.A. 373." 235 F. 64, 68.

▬ The contention that Clause 18 of the charter party [2] insulates the ship from liens made by the charterer is not applicable here. In addition to the authority cited above, 46 U.S.C.A. § 1303 (8) provides that there can be no agreement in a contract of carriage relieving the carrier from liability for loss or damage to or in connection with goods due to fault or failure in the duties and obligations provided in § 1303. Paragraph (2) of that section provides that the carrier "shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C.A. § 1303(2).

Just as terms in a bill of lading cannot defeat the protective measures guaranteed by Cogsa, neither can such measures be defeated by the terms of a charter party. Karobi Lumber Co. v. The S. S. Norco, 249 F.Supp. 324, 326 (S.D.Ala.1966).

By the terms of the charter party the owners of the DORIEFS authorized Marlin to issue bills of lading in the ship's name and to arrange for contracts of carriage from which cargo liens arise. The costs of discharging the rig at Benghazi borne by IDC gave rise to a cargo lien in its favor. The bill of lading in Clause 12 provides that "[l]anding and delivery charges and pier dues shall be at the expense of the goods *unless included in the freight herein provided for.*" (emphasis added). The bill of lading conclusively shows that the freight was prepaid by the shipper. No one contends that IDC was obliged to pay its own discharge costs.

Accordingly, the court finds that the M/V DORIEFS is liable *in rem* and her owner, *in personam* for all costs incident to the discharge of the cargo at Benghazi that were expended by IDC.

The court also finds that J. M. Cook Company and Lacy and Company are not liable to Marlin and did not participate in the breach of the April 14, 1964, agreement.

The court further finds that Marlin in breaching the agreement of April 14, 1964, is liable *in personam* to IDC for the expense involved in maintaining a crew and logistic equipment at the Port of Benghazi from June 3, 1964 to June 13, 1964.

Commerce Marine Line, Incorporated, was originally made a party respondent to this action. However, it appears from the subsequent pleadings and evidence presented at the trial that IDC has abandoned its claim against them. This court finds that there is no reason, either in fact or law, why it should remain a party to this action. Accordingly, it is ordered, adjudged and decreed that Commerce Marine Line, Incorporated is dismissed from this action.

Counsel will meet with the court at 4:30 p. m. on Friday, October 18, 1968,

2. 18. Charterers will not suffer not permit to be continued, any lien or encumbrances incurred by them or their agents

which might have priority over the title and interest of the owners in the vessel.

in order to determine the procedure for final disposition of the damage issues in this case.

The Clerk will file this Memorandum Opinion and provide counsel of record, Marlin International Corporation and Lacy and Company with true copies hereof.