**PARSONS & WHITTEMORE, Inc.,**
Plaintiff,

v.

**REDERIAKTIEBOLAGET NORDS-TJERNAN, Defendant.**

United States District Court
S. D. New York.
March 22, 1956.

Wachtell, Manheim & Grouf, New York City, Harold Manheim and Robert Braunschweig, New York City, of counsel, for plaintiff.

Kirlin, Campbell & Keating, New York City, Elmer C. Maddy, New York City, of counsel, for defendant.

HERLANDS, District Judge.

The question to be determined upon this motion for a stay of trial pending arbitration is whether or not the rate agreement sued upon and containing an arbitration provision is a "maritime transaction" or "a contract evidencing a transaction involving commerce" within the meaning of the United States Arbitration Act, Title 9 U.S.C.A. §§ 1–3. Unless the agreement is one or the other, this Court would be without jurisdiction to enforce the arbitration provision and to issue a stay in aid of it.

For the reasons set forth in this opinion, it has been concluded that the agreement is both a "maritime transaction" and "a contract evidencing a transaction involving commerce"; and that the application for the stay should be granted.

Plaintiff is a New York corporation which buys wood pulp on the Pacific Coast for export and sale to customers outside the United States. Defendant is a Swedish corporation. It maintains a steamship line and acts as a common carrier between the Pacific Coast of Canada and the United States and European ports. It is a member of the Pacific Coast European Conference, legalized under 46 U.S.C.A. § 814.

To induce shippers to patronize Conference lines exclusively, the Conference gives shippers who sign exclusive patronage or rate agreements a right to tariff rates lower than those applicable to nonsigners. These rate agreements are on forms prepared by the Conference. On March 5, 1951, plaintiff signed such an agreement. The utilization of a "Shippers Rate Agreement" appears to be standard operating procedure for member lines of the Pacific Coast European Conference.

It is essential to consider the terms of that rate agreement. It provides (paragraph "1") that the shipper [i. e., plaintiff] shall offer for transportation on vessels of the several steamship lines [who are members of the Pacific Coast European Conference and are referred to as "carriers"] "all of its shipments by water" on which the contract rates (as shown in the relevant tariff of the Conference) are applicable.

It further provides:

"This agreement covers all export shipments of the Shipper * * *. All such shipments shall be tendered to the Carriers for their vessels * * *. In agreeing to so confine the carriage of its (their) shipments to the vessels of the Carriers the Shipper hereby promises and declares it is the intent and purpose to do so without evasion * * *."

Paragraph "3" provides:

"This is a rate agreement and is not and shall not be construed to be a space agreement. Space agreements may be entered into as hereinafter provided with the Carriers, parties hereto. * * * "

Paragraph "4" provides:

"The Carriers severally agree to furnish from time to time, when requested, at the applicable contract rates * * *, space for the aforesaid shipments of the Shipper to the discharging ports of the Carrier(s), provided that such space is available when the Shipper makes application therefor. * * * "

Paragraph "5" provides:

"Arrangements for the actual carriage of the shipments covered by this Agreement is to be individual with the Carrier specially agreeing to transport the same and with the Carriers generally."

Paragraph "6" provides:

"The Shipper shall have the option of selecting any of the vessels operated by the several Carriers, subject to specific agreement between the transporting Carrier and the Shipper as to quantity to be shipped on the carrying vessel, port or ports of loading and discharge and as to all other matters affecting the transportation proper. This Agreement, and any shipments made pursuant thereto, is subject to all the terms, conditions and exceptions expressed in the space booking contracts, permits, dock receipts, mate's receipts and regular form of bill of lading of the transporting Carrier in use at the time of shipment, and to all of the rates, rules and regulations of the applicable Conference tariff."

Paragraph "7" provides that, with respect to any carrier who thereafter becomes a member of the Conference, "the Shipper shall have the right to request shipping space of such line in accordance with all of the terms and conditions of this Agreement."

Paragraphs "8" and "10" regulate "changes in rates."

Paragraph "11," the arbitration provision, reads as follows:

"In case of dispute, the Shipper and the Carrier(s) each agree to submit the matter under dispute to arbitration, each appointing an arbitrator and the two so chosen shall select an umpire to which Arbitration Committee all data requested in connection with the matter in dispute shall be made available. Decision of two or more members of the said Committee shall be binding on the parties and the arbitration shall be made under and pursuant to the terms and conditions of the United States Arbitration Act, being the Act of February 12, 1925, all of which terms and conditions shall be binding upon the parties hereto."

The complaint herein, filed on December 5, 1955, pleads two causes of action, as follows:

1. That pursuant to the rate agreement, plaintiff, on or about November 8, 1954, offered to defendant, three shipments of wood pulp for carriage from Everett, Washington, to London. Eng-

land; that defendant insisted that plaintiff sign a "confirmation," whereby plaintiff agreed to pay freight on the aforesaid shipments at the Pacific Coast European Conference tariff rate applicable to shipments of shippers who had not signed rate agreements; that the freight rate chargeable to shippers who had signed rate agreements with defendant was $21 per long ton of wood pulp, or a total of $21,872 for the three shipments tendered; that the freight rate chargeable to shippers who had not signed rate agreements with defendant was $24.35 per long ton of wood pulp, or a total of $25,358.79 for the three shipments tendered; that plaintiff, under protest, signed the "confirmation" presented to it by defendant, and returned it to defendant together with a letter of protest in which plaintiff denied the correctness of the rate demanded by defendant and reserved all of its rights in the premises; that subsequently, and on or about December 18, 1954, defendant issued its bills of landing (Nos. E/L–1, E/L–2 and E/L–3) for the three shipments of wood pulp in question; that on or about December 28, 1954, plaintiff, acting under the reservation of its rights, paid to defendant freight on the three shipments in question at the rate of $24.35 per long ton of wood pulp, or a total of $25,358.79; that consequently defendant, in violation of the rate agreement, caused plaintiff damage in the sum of $3,486.79, this sum being the excess which plaintiff was compelled to pay defendant over and above the rate which it should have paid under the terms of the rate agreement.

2. The second cause of action is similar to the first. It is based on the same rate agreement, but relates to four shipments of wood pulp for carriage from Everett, Washington, to London, England, and Antwerp, Belgium, offered to defendant on or about January 14, 1955, pursuant to the rate agreement. As to these shipments, defendant also insisted that plaintiff pay freight on the aforesaid shipments at the rate applicable to shipments by shippers who had not signed the Conference rate agreement. Defendant paid the higher rates charged nonsigners over protest. The total excess differential as to these four shipments amounted to $2,297.14.

The moving affidavit of defendant states that defendant has been ready and willing to proceed to arbitration with the disputes. The affidavit does not state why plaintiff was charged higher rates than those set forth in the rate agreement. However, defendant's memorandum (p. 6) in support of the motion states: "The very reason plaintiff was denied these lower rates by defendant was that it had breached the agreement by making shipments in foreign commerce in violation of the contract."

The litigation is somewhat complicated by the fact that plaintiff, in January 1955, instituted in the Municipal Court of the City of New York, an action to recover the alleged excess charge of $2,643.54, with respect to two of the three shipments which form the basis for plaintiff's first cause of action herein. Defendant then applied to the Municipal Court for a stay of the action "until arbitration of the dispute between the parties has been had in accordance with the terms of the contract between the parties," pursuant to New York Civil Practice Act, § 1451. The stay was denied by the Municipal Court. On appeal to the Appellate Term of the New York Supreme Court, the order was reversed; and the stay was granted. Plaintiff thereupon appealed to the Appellate Division which, in a carefully reasoned opinion by Mr. Justice Bergan, for a unanimous court, affirmed the Appellate Term's reversal of the Municipal Court on the issue of whether the stay pending arbitration should be granted, 286 App. Div. 553, 145 N.Y.S.2d 466, 468, 1956 A.M.C. 247.

In the course of his opinion, Mr. Justice Bergan made the following significant statements:

"Whether the courts of the United States would or would not enforce arbitration under federal act in the conditions shown by this agreement

is a question we need not answer definitively. We have before us a contract which on its face purports to relate to a 'maritime' transaction, and to 'commerce' which are both of the two alternative subject matters required to be evidenced by contracts falling within the scope of the United States Arbitration Act.

With such a contract before us, we would as a matter of course stay the action at law until the right to arbitration had been tested in an appropriate and direct proceeding. Even as to a foreign arbitration agreement, the New York court will stay an action on the subject matter falling within the apparent terms of the agreement, although it would not act affirmatively to compel the parties to proceed to arbitrate in the foreign jurisdiction. Matter of Inter-Ocean Food Products, Inc., 1923, 206 App.Div. 426, 201 N.Y.S. 536.

\* \* \* \* \* \*

"Appellant's argument is that the federal courts will not take jurisdiction because the rate agreement is not a 'maritime contract' or a contract involving 'commerce.'

"But the agreement provided for exclusive use by the shipper of the maritime shipping facilities of the group of steamships; and provided also for the rate to be charged. The action which plaintiff instituted in the Municipal Court was based on a breach of this contract for an overcharge on two actual maritime shipments. The contract on which plaintiff sued was the same contract (the rate agreement) which contained the arbitration clause; and it can scarcely be doubted that an action to recover an overpayment actually made in actual shipments across the ocean *prima facie* is based on either a 'maritime transaction' or a 'transaction involving commerce.'"

Where, as here, the parties have proceeded to act upon the general rate agreement by entering into specific space agreements (bills of lading) covering specific shipments, the rate agreement and each of the ensuing space agreements must be viewed as integrated transactions. The totality of facts and the configuration of interrelationships set up by the rate and space agreements must be considered in terms of the subject-matter, the functional operations, and the realities of the business. Whether the contract sued on is based on either a "maritime transaction" or a "transaction involving commerce" is not a problem of dialectical analysis.

The rate agreement is in the nature of an exclusive requirement contract, while the individual space or affreightment agreements for the actual carriage of the shipments are the projection of the terms of the rate agreement into the transportation proper. Thus, the two types of agreements are inextricably intertwined and interdependent. In common speech, they are the head and tail of the same coin. The rate agreement, by its plain terms, required plaintiff to ship exclusively in Conference bottoms in return for a lower preferential rate; and such shipments and the Conference ships were the quintessence of the transaction.

As was said by Mr. Justice Stone in Krauss Bros. Lumber Co. v. Dimon S. S. Corp., 1933, 290 U.S. 117, 122, 54 S.Ct. 105, 106, 78 L.Ed. 216:

"But the undertaking to charge the agreed freight and no more is an inseparable incident to every contract of affreightment, as essential to it and as properly a subject of admiralty jurisdiction as is the obligation of the cargo to pay freight when earned, or of the vessel to carry safely. See Matson Navigation Co. v. United States, 284 U.S. 352, 358, 52 S.Ct. 162, 76 L.Ed. 336. It is unlike an agreement to pay a commission to the broker procuring the charter party, Brown v. West Hartlepool Steam Navigation Co., 5 Cir., 112 F. 1018, or a provision for storing cargo in the vessel at the end of the voyage, Pillsbury Flour Mills Co. v. Interlake Steamship Co., 2 Cir.,

40 F.2d 439, which, though embodied in the contract of carriage for hire, are no necessary part of it."

The Krauss case was recently discussed at great length by the Court of Appeals for the Second Circuit in Sword Line, Inc., v. United States, 2 Cir., 1956, 230 F.2d 75, 77. In expounding the doctrine of admiralty jurisdiction as laid down by the Krauss case, Chief Judge Clark said:

"We think it sounder, and more in accordance with the nature of admiralty, to rest upon the inherent maritime character of the underlying transaction, rather than upon an attempt to force this claim into the mold of a breach of contract. This broader approach also answers various aspects of the libelant's present contention, such as that admiralty jurisdiction cannot rest upon a claim on a statute or must concern a single definite vessel. Such limitations are contrary to the real spirit of admiralty, and actually have not been followed in various situations, of which some examples are collected in the footnote. These all support, often without explicit analysis, admiralty jurisdiction over these claims so basically and intimately intertwined with our vast shipping and maritime interests."

In 1 Benedict on Admiralty 130, 6th Ed., the following observation is made:

"It is not always easy to determine what is a maritime contract. The dividing line between causes maritime and non-maritime is not always strongly marked. It is believed that a sure guide, in matters of contract, is to be found in the relation which the cause of action has to a ship, the great agent of maritime enterprise, and to the sea as a highway of commerce. A contract relating to a ship in its use as such or to commerce on navigable waters is subject to the maritime law and the case is one of admiralty and maritime jurisdiction, whether the contract is to be performed on land or water."

Moreover, the contract sued upon evidences a transaction involving commerce. Petition of Prouvost LeFebvre of Rhode Island, Inc., D.C.S.D.N.Y.1952, 105 F.Supp. 757.

In my view of the matter, the stay should be granted under section 3 of the United States Arbitration Act, because the rate agreement satisfies both of the alternative requirements of that section: it is a "maritime transaction" and it is also a contract "evidencing a transaction involving commerce."

Plaintiff argues that the rate agreement is not a "maritime transaction," but only a contract "preliminary" to maritime transactions, citing Diefenthal v. Hamburg-Amerikanische Packetfahrt Actien-Gesellschaft, D.C.E.D.La.1891, 46 F. 397, appeal denied Diefenthal & Salomon v. Hamburg-Americkanischer Packetfahrt Aktien Gesellschaft, 159 U. S. 251, 15 S.Ct. 1038, 40 L.Ed. 139; Marquardt v. French, D.C.S.D.N.Y. 1893, 53 F. 603; The City of Clarksville, D.C.Ind.1899, 94 F. 201; Virginia-Carolina Chemical Co. v. Chesapeake Lighterage & Towing Co., 2 Cir., 1922, 279 F. 684.

All of the cases cited by plaintiff are distinguishable from the situation at bar. The Diefenthal case involved a contract to deliver to ship owners on board their several vessels stores and supplies, such as meat, eggs and vegetables for the use of passengers and crews. In the Marquardt case, the Court dealt with a contract to procure insurance. In the The City of Clarksville case, the Court also ruled that a contract to procure insurance does not come within the jurisdiction of admiralty but predicates only a common-law action. In the Virginia-Carolina Chemical Co. case, Judge Hough for the Circuit Court of Appeals for the Second Circuit, cited the Marquardt case with approval on the point that a failure to procure insurance is not cognizable in admiralty.

A contract to deliver foodstuffs or to secure insurance is, by its very subject-matter, fundamentally different from a contract between a shipper and shipown-

ers to ship exclusively in the shipowners' vessels at specified rates.

Plaintiff also argues that the rate agreement does not evidence any transaction, but that it only contemplates the possibility that future space agreements for the shipment of cargo may be made; that the rate agreement does not provide that the arbitration clause shall be deemed to be included in any future space agreements; and that the space agreements (paragraph 20 [b]) confer exclusive jurisdiction of any disputes under the space agreements upon the City Court of Stockholm, Sweden. In support of the above contentions, plaintiff cites Application of Susquehanna Collieries Co., D.C.M.D.Pa.1943, 49 F.Supp. 845; In re Woerner, 2 Cir., 1929, 31 F.2d 283; and Petition of Prouvost LeFebvre of Rhode Island, Inc., D.C.S.D.N.Y.1952, 105 F.Supp. 757.

The above-cited cases do not establish plaintiff's thesis. In the Susquehanna Collieries Co. case, the Court refused to enforce the arbitration provision in a collective bargaining agreement because that agreement was limited to wages and employment conditions in Pennsylvania coal fields and it did not evidence a "transaction involving commerce," as defined in the United States Arbitration Act. In the Woerner case, Judge Manton, for the Circuit Court of Appeals for the Second Circuit held, *inter alia,* that the particular contract before the Court—whereby one party agreed to contribute money and the other agreed to furnish services in connection with the organization of a corporation that would import certain machines —did not evidence a transaction involving commerce. The Prouvost case supports the view expressed by this Court, for it is authority for the proposition that, in order to determine whether the particular contract evidences "a transaction in commerce," reference must be made to the terms of the contract. In the case at bar, the terms of the rate agreement evidence such a transaction, inasmuch as the shipments covered by it were to be on the high seas, from the Pacific Coast to European ports.

The plaintiff's argument that the City Court of Stockholm, Sweden, has exclusive jurisdiction, overlooks the crucial fact that the provision for such jurisdiction is *not* contained in the rate agreement sued upon, but is contained in the space agreements (the bills of lading) and relates only to a dispute arising under the particular bill of lading.

In view of the foregoing, it is not necessary to determine the interesting question whether the decision of the Appellate Division is controlling upon this Court upon the alternate theories of [1] res judicata and [2] Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, as expounded in the recent case of Bernhardt v. Polygraphic Co. of America, Inc., 1956, 350 U.S. 198, 76 S.Ct. 273; 42 A.B.A. Journal 265 (1956).

Defendant's motion for a stay is granted. Settle order on notice.