UNION OF TELEPHONE WORKERS, Plaintiff,

v.

NEW YORK TELEPHONE COMPANY, Defendant.

United States District Court
S. D. New York.
Dec. 28, 1964.

**944**

John J. Corrigan, New York City, for plaintiff.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendant; Edward Silver, G. Wallace Bates, William P. Witman, Martin J. Oppenheimer, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge:

Plaintiff Union sues under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, to compel arbitration of a labor dispute alleged to arise under a collective bargaining agreement. Defendant Company has refused to arbitrate, maintaining that there is no issue which is arbitrable under the agreement.

Both parties have moved for summary judgment. The pertinent facts are undisputed.

The Union and the Company are both engaged in an industry affecting commerce within the meaning of §§ 2 and 501 of the Act, 29 U.S.C. §§ 142, 152. The Union is the collective bargaining unit for employees of the Commercial and Headquarters Departments of the Company in the Manhattan, Bronx, Westchester and Long Island territories. On February 1, 1961 the Union and the Company entered into a collective bargaining agreement covering a wide range of aspects of the employer-employee relationship, including wages, hours and conditions of employment.

The agreement contained a general arbitration clause (Article XIV) which insofar as pertinent here reads as follows:

"Section 1. If at any time, a difference arises between the Union and the Company regarding the true intent and meaning of a provision of this Agreement or a question as to the performance of any obligation hereunder, a conference shall be held between a committee of the Board of Directors of the Union and a Management Committee of the Company, consisting of such representatives of the Company as may from time to time be designated for the purpose, in an effort to settle said differences. If, after such conference, the matter is not settled, either the Union or the Company may institute arbitration proceedings pursuant to the provisions of this Article to determine the issue in question, it being understood that the right to require arbitration extends only to those matters for which arbitration is expressly provided in this Article."

"Section 3. The arbitrator shall have no authority to add to, subtract from, or in any way modify the terms of the Agreement."

Article XIII of the agreement deals with grievance procedure. Under Section 2 of that Article grievances involving "claimed contract violations, wages, hours, conditions of employment, or claims by employees of unfair, improper, or discriminatory treatment" are reviewable in a series of steps commencing at the Steward-Supervisor level and culminating in a General Review Board in which labor and management are equally represented. In the event of a tie in the Review Board the Union may demand arbitration under Article XIV of questions including (1) "the true intent and meaning of a provision of this agreement or a question as to the performance of any obligation thereunder" (the precise language used in the arbitration clause); (2) a claim that a wage progression has been improperly withheld; (3) a claim that the Company acted in bad faith in selecting a regular employee for permanent involuntary transfer; and (4) certain claims that discharge or demotion for cause was without proper reason.

The titles and occupational classifications of the employees covered in each department are separately listed in Appendix A to the agreement and, preceding each such list, Appendix A contains the following clause:

"The following is a list of the existing titles and occupational classifications of all Commercial Depart-

ment employees covered by this Agreement. It is agreed that there may not at all times be employees in the positions covered by all of these titles and classifications and conversely changing conditions or the needs of the business may warrant the establishment of additional titles or classifications. Accordingly, the Company may make additions to the present list of titles or classifications or changes in work assignment of any position on the list as in its judgment may become necessary. The Company will notify the Union of any such additions or of substantial changes in the work assignment of any existing position. The Company agrees to stand ready to negotiate wages and hours for any titles or classifications that may be added and the classification of existing titles for which the work assignment has been substantially changed."

Appendix B establishes the detailed wage scales and wage progressions applicable to each classification listed in Appendix A.

Article I, § 2, of the agreement provides that the employees covered include not only all whose titles and classifications are set forth in Appendix A but also "employees for whom additional titles and classifications are established in accordance with Appendix A" which is made "a part hereof."

The present dispute concerns the wages payable to Representatives and Toll Service clerks whose titles and classifications were listed in Appendix A. During the term of the agreement the Company made changes in the work assignments of employees in these occupational classifications. For purposes of this action the Company concedes that the work changes were substantial. No change was made in the wages of the employees whose work assignments were altered.

The employees involved contended that appropriate upward revisions in wages should have been made to compensate for what they claimed to be increased work load under the changed work assignments. Their claims were not presented as grievances under Article XIII of the agreement but the Union requested that the Company negotiate these wage questions under the last sentence of the clause in Appendix A by which the Company agreed "to stand ready to negotiate wages and hours for * * * the classification of existing titles for which the work assignment has been substantially changed."

The Company agreed to negotiate. Negotiations were unsuccessful, however, since the Union and the Company were unable to agree and the wage rates in dispute remained unchanged.

The Union then sought arbitration of the dispute under Article XIV, the arbitration clause. The Company refused to arbitrate and the Union brought this action to compel the Company to do so.

A pre-trial order, consented to by both parties, has been entered which poses the issue in the action as follows:

"Does the dispute between the parties with regard to the appropriate wage rate to be paid to representatives and to toll service clerks, in the light of substantial changes made in their work assignments constitute an arbitrable issue within the meaning and purview of Article XIV, Section 1, of the said labor agreements?"

This is, in essence, the issue in this case.

In determining that question, federal law "fashion[ed] from the policy of our national labor laws" is controlling. Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 456, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

That policy is "to promote industrial stabilization through the collective bargaining agreement" and thus to achieve industrial peace. United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 1350, 4 L.Ed.2d 1409 (1960).

Arbitration has a central role in effectuating national labor policy. It is

"the substitute for industrial strife" and "a part and parcel of the collective bargaining procedure itself." The role of arbitration in labor cases is thus quite different from that of ordinary commercial arbitration which is "merely a substitute for litigation." United Steelworkers of America v. Warrior & Gulf Nav. Co., supra, at p. 578, 80 S.Ct. at p. 1351.

■ The collective bargaining agreement creates more than an ordinary contract relationship. It is "a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." Such a contract covers the whole employment relationship and it must be viewed as an effort to erect a system of industrial self-government. United Steelworkers of America v. Warrior & Gulf Nav. Co., supra, at p. 578, 80 S.Ct. at p. 1351.

■ Arbitration is, of course, a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit. United Steelworkers of America v. Warrior & Gulf Nav. Co., supra, at p. 582, 80 S.Ct. at p. 1353. Whether or not the Company is bound to arbitrate, as well as what issues it must arbitrate, are matters to be determined by the Court on the basis of the agreement entered into between the parties. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 546–547, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

■ But in determining what the parties have agreed to arbitrate under the collective bargaining agreement involved, it is now settled that all matters of dispute arising out of the contract are deemed to fall within the purview of a general arbitration provision, apart from matters which the parties have expressly excluded. As the court said in United Steelworkers of America v. Warrior & Gulf Nav. Co., supra, 363 U.S. at pp. 582–583, 80 S.Ct. at p. 1353:

" * * * the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that governs the asserted dispute. Doubts should be resolved in favor of coverage."

And the court said further at pp. 584–585, 80 S.Ct. at p. 1354:

"In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."

When these principles are applied to the case at bar the answer to the question presented is quite clear.

The question which the Union seeks to arbitrate is whether the representatives and clerks whose work assignments were substantially changed by the Company are entitled to an increase in wages by reason of such changes. That question, however, which seems simple on its face, is really a double-barrelled one.

For the Company claims it is under no *obligation* under the agreement to make such wage changes and that its obligation thereunder goes only so far as to "negotiate" on the subject with the Union. If negotiations fail, says the Company, its obligation under the agreement with respect to the wages to be paid to employees in classifications which have had their work load substantially changed comes to an end. Presumably this would be true whether or not under the circumstances the wages paid are fair and reasonable or unfair and arbitrary. In essence, what the Company says here is that under the terms of this collective bargaining agreement wages to be paid on changes in work assignments of existing classifications are, except for the ob-

ligation to negotiate, outside the purview of the agreement and the arbitration machinery which it provides. Any disputes with relation to such wage rates are to be settled by arm's length non-contractual dealing with the employees so situated.

The Union, on the other hand, asserts that the Company's contractual obligations under the agreement are by no means so limited. It contends that the Company has the obligation under the agreement to pay such wages to employees in that posture as would be fair and reasonable in the light of the detailed wage scales established by the contract, and that such an obligation arises from a fair reading of the agreement itself. It contends that even assuming an obligation is not expressly spelled out in the agreement, it is at least inferable from the appendices when read in the context of the agreement as a whole, and, indeed, is implicit in the agreement. Thus the Union urges the Company is under a contractual obligation to reach a reasonably fair result in terms of wages payable to employees whose work assignment has been substantially changed by its unilateral action.

This initial phase of the dispute involves a controversy as to whether the Company has an obligation under the agreement to make appropriate and fair wage adjustments under such circumstances. It seems plain that this phase involves a dispute as to "the true meaning and intent" of the provisions of the agreement falling within the purview of the first portion of the arbitration clause. The determination of that question goes to the essence of the dispute between the parties and plainly must be decided before the ultimate question of what wages ought to be paid to the employees involved can be reached at all. It is plainly a question to be determined by the arbitrator and not by the court.

I do not attempt to pass on that question here or to indicate any views on its merits for "There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties." United Steelworkers of America v. Warrior & Gulf Nav. Co., supra, at p. 579, 80 S.Ct. at p. 1351, quoting Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1482, 1498–1499 (1959). This is a matter lying peculiarly within the competence of an arbitrator with knowledge "of the common law of the shop" and with judgment "with respect to considerations which are not expressly set forth in the contract as a criterion." United Steelworkers of America v. Warrior & Gulf Nav. Co., supra, at p. 582, 80 S.Ct. at p. 1352.

If the arbitrator should determine that there is no such obligation under the agreement as the Union claims, then plainly the arbitrator can go no further and the Union has lost on the merits. Presumably the arbitrator would then render an award in favor of the Company.

If, on the other hand, the arbitrator should determine that there is such an obligation under the contract as the Union contends he then turns to the ultimate issue between the parties. That issue is whether the Company performed its obligation as to wages under the circumstances presented here. In other words, did the Company by refusing to make any wage adjustments after substantial work changes in existing classifications were put into effect, violate an obligation to make a fair and reasonable adjustment of the wage scales of these employees?

That is a dispute within the purview of the second part of the arbitration clause raising "a question as to the performance of any obligation" under the agreement. Both questions concern matters for which arbitration is expressly provided in the arbitration clause.

I see no merit in the contention of the Company that either of these two questions are excluded from arbitration by the terms of the agreement in the light of the standards to be applied in determining arbitrability. It certainly cannot be said here "with positive assurance

that the arbitration clause is not susceptible of an interpretation that covers these disputes."

The Company points to no express provision excluding either phase of the dispute from arbitration. There is no forceful (not to say most forceful) evidence in the agreement of a purpose to exclude these issues.

■ The Company claims that such a purpose to exclude is found in what it states in its brief to be "an express provision that any Union demand for an increase in wage rates is to be resolved solely through negotiations between the Company and the Union." But there is no such express provision in the agreement. The last sentence of the Appendix A clause to which the Company looks does not so provide. It contains no language of exclusion but merely says that the Company "agrees to stand ready to negotiate" the question. It does not say that if negotiations are unsuccessful the Company shall have the last word on the matter or that the employees are left without the usual contract arbitration remedy if the Company refuses to agree.

Both parties emphasize the word "negotiate", each claiming it supports their interpretation of the agreement. Whether it does or not, or whether the question as to what obligations the Company has assumed in connection with the subject matter in dispute is to be determined by reference to other portions of the agreement or to the agreement as a whole, is plainly a question of meaning and intent. Far from being excluded from arbitration such questions are specifically left to the arbitrator.

There is no language in the arbitration clause itself excluding this dispute from arbitration. It is true, as the Company says, that the arbitrator has no authority to "subtract from, or in any way modify the terms of the agreement." (Article XIV, Section 3). But this furnishes no solution of the questions presented by the dispute here and, indeed, begs the whole question. See Carey v. General Elec. Co., 315 F.2d 499, 507 (2 Cir. 1963). See also Carey v. General Elec. Co., supra, at p. 506; International Union of Elec., etc., Workers v. Westinghouse Elec. Corp., 228 F.Supp. 922, 924 (S.D.N.Y.1964). Section 3 plainly does not exclude such questions from arbitration.

The question of whether there is any obligation on the Company under the agreement to pay a fair wage rate to employees whose work load has been substantially increased is plainly a question of interpretation of the agreement which is specifically left to the arbitrator and should not be decided by the courts. Indeed, for the courts to go into that question would be to infer a purpose to exclude which "necessarily comprehends the merits" and "the court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of the labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator." United Steelworkers of America v. Warrior & Gulf Nav. Co., supra, 363 U.S. at p. 585, 80 S.Ct. at p. 1354.

■ Moreover, where the parties to this agreement intended to exclude specific matters from arbitration they had no hesitancy in so doing by clear language. See, e. g., Article XII, Section 3. The absence of specific language of exclusion from arbitration of the disputes of the kind involved here is in itself an indication that the parties intended such disputes to be arbitrable. See Carey v. General Elec. Co., 315 F.2d 499, 506, fn. 4 (2 Cir. 1963). Compare Local 201, International Union of Elec., etc., Workers v. General Elec. Co., 262 F.2d 265, 268–269 (1 Cir. 1959); Employees Labor Ass'n of Procter & Gamble Mfg. Co. v. Procter & Gamble Mfg. Co., 172 F.Supp. 210, 212 (D.Kan.1959).

It should also be noted that Article XIII of the agreement dealing with grievance procedure far from excluding such grievances as this from the purview of the arbitration clause has marked indications to the contrary. Section 2 of

Article XIII provides that "Grievances involving claimed contract violations, wages, hours, conditions of employment, or claims by employees of unfair, improper, or discriminatory treatment" may be processed through the normal grievance procedures. If not there settled such grievances ultimately are to be submitted to arbitration under Article XIV if they involve "the true intent and meaning of a provision of the agreement or a question as to the performance of any obligation thereunder." The issues in the present dispute may well fall within one or more of these subjects of grievance. If they do they plainly involve questions of intent and meaning of the agreement and performance of obligations thereunder. It cannot be said that the parties contemplated the exclusion of such grievances from arbitration under the language used in Article XIII which is precisely that also used in Article XIV.[1]

The titles and classifications of the employees affected by the changes in work assignment are specifically listed in Appendix A which is made a part of the agreement and these employees are covered by it. Appendix B sets specific wage scales for each classification. Yet the Company would have the court hold that the arbitration machinery set up by the agreement to avoid industrial strife during its term is not available to settle a dispute over the wages payable to employees in those very titles and classifications.

When counsel for the Company was asked on oral argument what remedy was available to the covered employees in such a situation, his answer was that they could strike. Such a result would frustrate the very purpose of including the arbitration clause instead of permitting the clause to be "a vehicle by which meaning and content are given to the collective bargaining agreement." United Steelworkers of America v. Warrior & Gulf Nav. Co., supra, 363 U.S. at p. 581, 80 S.Ct. at p. 1352.

Finally the Company contends that by submitting this dispute to the arbitrator the court would be permitting the arbitrator himself to determine the question of arbitrability. This, it is said, would violate the strictures of footnote 7, p. 583, 80 S.Ct. p. 1353, of United Steelworkers of America v. Warrior & Gulf Nav. Co., supra. That footnote indicates that where questions of arbitrability are sought to be excluded from court determination and left to the arbitrator "the claimant must bear the burden of a clear demonstration of that purpose." The Company says that no such "clear demonstration" has been made here.

But that contention derives from a misunderstanding of the issues involved in the dispute between the parties. As has been pointed out, the initial phase of the dispute concerns what *obligations* with respect to the wage rates involved the Company has under the agreement. The *question is not* whether the dispute itself is arbitrable.

In Warrior the court held that the dispute there as to whether contracting out of work involved a violation of the Company's obligations under the agreement was not to be excluded from arbitration through "the back door of interpreting the arbitration clause." The dispute here should not be excluded from arbitration through such a back door either.[2]

1. This is not to say that the grievance machinery should necessarily have been followed here and no claim is made by either of the parties that it should have been. But even if any such suggestion were made the question raised thereby would be merely a matter of "procedural arbitrability" which is merely one "aspect of the issue" and is clearly for the arbitrator also. See John Wiley & Sons,

Inc. v. Livingston, supra, 376 U.S. at p. 557, 84 S.Ct. at p. 918.

2. It may be noted that in cases arising under an arbitration clause similar to that in the case at bar, the question of arbitrability has been left to the arbitrators on the theory that this was the intention of the parties. International Union, etc. v. Cardwell Mfg. Co., 304 F. 2d. 801, 803 (10 Cir. 1962); Arkansas-

950

The Company's motion for summary judgment dismissing the complaint is denied and the Union's motion for summary judgment directing the Company to proceed to arbitration is granted.

Settle judgment accordingly on notice.

Louisiana Gas Co. v. Oil, etc., Workers, 320 F.2d 62 (10 Cir. 1963). See Food Handlers, etc. v. Pluss-Poultry, Inc., 158 F.Supp. 650, 657 (W.D.Ark.), (dictum), aff'd 260 F.2d 835 (8 Cir. 1958); Local 205, United Elec., etc., Workers v. General Elec. Co., 233 F.2d 85, 101 (1 Cir. 1956), (dictum), aff'd 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957). It is, however, unnecessary to reach that question here.