UNIVERSAL AMERICAN CORPORATION and Precision Bearings India, Ltd., Libelants,

v.

S. S. HOEGH DRAKE, her engines, boilers, etc., Skibs A/S Arizona, Leif Hoegh & Co. and Hoegh Lines, Respondents.

No. 65 AD. 1138.

United States District Court
S. D. New York.

Dec. 12, 1966.

Hill, Rivkins, Warburton, McGowan & Carey, New York City, Joseph T. McGowan, Clare E. Walker, New York City, of counsel, for libelants.

Haight, Gardner, Poor & Havens, New York City, Wharton Poor, New York City, R. Glenn Bauer, New York City, of counsel, for respondents.

## MEMORANDUM

TENNEY, District Judge.

Respondents, in accordance with the provisions of Admiralty Rule No. 58 of the United States Supreme Court, move to dismiss the libel on the ground that the claims alleged therein are time-barred under the provisions of the bills of lading and by the United States Carriage of Goods by Sea Act (49 Stat. 1208 (1936), 46 U.S.C. § 1303(b) (1964)) incorporated into said bills of lading. Suit is brought to recover damage to cargo shipped from New York and delivered in Bombay, India.

There appears to be no genuine issue as to the following material facts. The 87 boxes of machinery which are the subject of the libel herein were on board S. S. "HOEGH DRAKE" at New York on October 8, 1963, and were delivered at Bombay, India, on or about November 10, 1963. Three bills of lading, two of which were dated October 3, 1963, and one of which was dated October 8, 1963, were issued to Norma-Hoffman Bearings Corporation (hereinafter referred to as "Norma-Hoffman"), the shipper of said machinery. Libelant Universal American Corporation (hereinafter referred to as "Universal") is the successor in interest to Norma-Hoffman. Libelant Precision Bearings India, Ltd. (hereinafter referred to as "Precision") is the ultimate consignee and holder in due course of said bills of lading.

Each of the bills of lading contained a paragraph 18, reading as follows:

"Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent the notice must be given within three days of the delivery. In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after the delivery of the goods or the date when the goods should have been delivered."

Said bills of lading also contained the following paragraph 19:

"All agreements or freight engagements for the shipment of the goods are superseded by this bill of lading, and all its terms, whether written, typed, stamped, or printed, are accepted and agreed by the shipper to be binding as fully as if signed by the shipper, any local customs or privileg-

es to the contrary notwithstanding. Nothing in this bill of lading shall operate to limit or deprive the carrier of any statutory protection or exemption from, or limitation of liability. If required by the carrier, one signed bill of lading duly endorsed must be surrendered to the agent of the ship at the port of discharge in exchange for delivery order."

Each bill of lading incorporated the provisions of the Carriage of Goods by Sea Act of the United States.

Prior to the issuance of the bills of lading herein and on August 21, 1962, Norma-Hoffman entered into a Memorandum of Agreement with the members of The India, Pakiston, Ceylon and Burma Outward Freight Conference (hereinafter referred to as "Freight Conference"). The Memorandum (Contract No. 7285) is a dual-rate contract between the Freight Conference relating to the charging of lower rates to shippers who agree to confine their patronage exclusively to Conference lines.[1] Libelants urge that such Memorandum contains an arbitration clause applicable to the present dispute. Paragraph 7 of the Memorandum reads as follows:

"7. Any and every dispute arising out of, or relating to, this agreement or the breach hereof shall be settled by arbitration in New York, N. Y. One arbitrator shall be named by the Merchant or Merchants who shall be parties to the dispute, one arbitrator shall be named by the Carriers then parties to the agreement, and a third arbitrator shall be named by the two arbitrators so chosen or if they cannot agree, the third arbitrator shall be named by the American Arbitration Association. Both Parties are required to name ar-

---

1. Pg. 4. Paragraph 1 of the Agreement provides that the "merchant" (Norma-Hoffman Bearings Corp.), in consideration of the rates and other conditions stated in the Agreement and in the Conference Tariff, agrees to forward by vessels of the carriers all shipments made directly or indirectly by him, his agents, subsidiary associates and/or parent companies, from ports in the U. S. Atlantic & Gulf to ports of India, Pakistan, Ceylon and Burma, subject to certain exclusions. Paragraph 1 further provides that it is a breach of contract if, before the time of shipment and with the intent to avoid his obligations, the merchant or his agents, etc., divest themselves of the legal right to select the carrier and the shipment is carried by a non-Conference carrier.

Paragraph 2 provides that the rates of freight under this Agreement are subject to increase or decrease from time to time, the carriers giving written notice not less than 90 days in advance of the increase.

Paragraph 3 gives the merchant the option of selecting any of the vessels operated by the respective Conference members, provided that required space to port of destination is available. The merchant must agree with the selected Conference member as to the quantity per vessel, port or ports of loading and/or discharge. If the Conference members fail to furnish space, the merchant is free to secure space elsewhere.

Under paragraph 4, shipments are subject to all the terms and conditions contained in the respective carrier's shipping documents.

Paragraph 5 permits the agreement to be cancelled on 90 days' written notice by the merchant or by one or more, or all, of the Conference members.

Paragraph 6 provides that if any shipment is made in violation of this Agreement, the merchant shall be liable to the carriers jointly for a sum equal to what would have been paid by the merchant to a carrier had the shipment been made under this Agreement but less the actual cost incurred by any of the carriers handling such cargo.

Paragraph 7 provides that any and every dispute arising out of, or relating to, this Agreement or the breach thereof shall be settled by arbitration in New York, N. Y. One arbitrator is to be named by the merchant and the other arbitrator "by the Carriers then parties to this Agreement. * * * "

Paragraph 8 provides that damages recoverable for breach of this Agreement, except as provided in clause 6, shall be limited to actual damages, to be determined after breach.

Paragraph 9 permits the Conference members to suspend or cancel the Agreement in case of *force majeure* and also allows the merchant to cancel where the same conditions affect or threaten to affect the ability of the merchant to perform.

bitrators within thirty (30) days after one or the other has been given notice. Any award made by the majority of the arbitrators shall be final and binding. In any arbitration proceeding, including enforcement of any award, service of any and every notice and other paper may be made outside of the State of New York by registered mail, telegraph or cable with the same force as if made personally within said State. In each case of such service, reasonable time shall be allowed for response to the notice or other paper served."

It is important to note, however, that paragraph 4 of the Memorandum provides that:

"4. Shipments under this agreement are subject to all the terms and conditions contained in the respective Carrier's engagement note, permit, dock receipt and regular form of bill of lading, in use by the Carrier when shipments are tendered."

Furthermore, the freight contract entered into between Norma-Hoffman and respondents in September 1962 (Contract No. N.Y.I./116), which libelants allege in their libel and complaint was issued by respondents pursuant to the abovementioned Memorandum (¶ Twelfth) states, in paragraph 1 of its Terms and Conditions, that the booking "is subject to all terms and conditions of the vessel's usual bill of lading, whether issued or not, and of the current tariff of carrier, all of which are hereby made a part of this contract" and, in paragraph 15, it is stated that the "provisions of the Carriage of Goods Act of the United States * * * shall govern throughout the entire time the goods are in the custody of the carrier."

The libel alleges that the respondents are business entities organized and existing under and by virtue of the laws of Norway, with an office and place of business in this district, and were and are now engaged in business as common carriers of merchandise by water for hire and owned, managed, chartered and/or otherwise controlled the S. S. "HOEGH DRAKE" which was a general merchant vessel employed as a common carrier for the carriage of merchandise by water for hire.

The libel further alleges that there were delivered to the respondents as common carriers 87 boxes of machinery, material and supplies for the construction of a bearing manufacturing plant, and that the respondents accepted the shipment and agreed to transport it to Bombay, India.

In article "Sixth" the libel alleges that the respondents did not deliver the shipment in the same good order and condition as when delivered to and received by them, in violation of their contractual obligations and duties.

Under the heading of a "SECOND CAUSE OF ACTION", the libel alleges that the respondents are required to arbitrate the claims set out in the libel because of a provision in clause 7 of Freight Conference Freight Agreement No. 7285, dated August 21, 1962.

█ It seems clear that the First Cause of Action is barred; the libel was not filed herein until November 17, 1965, more than two years after delivery of the goods. The shipment was subject to the United States Carriage of Goods by Sea Act, which provides in Section 3 (6):

"In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered." (Title 46 U.S.C. § 1303(6)).

This provision of the Act was incorporated in the bills of lading which repeated the statutory language.

Accordingly, as to the first claim, the libel must be dismissed. United States v. S. S. Mormacteal, 213 F.Supp. 149 (S. D.N.Y.1962); M.V.M., Inc. v. St. Paul Fire & Marine Ins. Co., 156 F.Supp. 879, 883 (S.D.N.Y.1957), rev'd on other grounds sub. nom. St. Paul Fire & Marine Ins. Co. v. United States Lines Co., 258 F.2d 374 (2d Cir.1958), cert. denied,

359 U.S. 910, 79 S.Ct. 587, 3 L.Ed.2d 574 (1959).

With respect to the Second Cause of Action, requiring respondents to arbitrate the claims set out in the libel pursuant to the provisions of clause 7 of the Memorandum, as indeed with respect to both causes of action, it is agreed that there is no genuine issue of material fact, the sole question being a question of law to be resolved by the Court—i.e., did the bills of lading constitute the entire contract between the parties? Although not clearly delineated by their pleading, libelants would appear to predicate their claim on the fact that the boxes of machinery were delivered in or about September 1962, through on or about June 17, 1963, pursuant to the Memorandum of August 21, 1962, and the freight contract of September 1962, which latter document provided for shipment sometime between the end of November and the end of December 1962, whereas shipment was not made until October 1963. Although not alleged in the libel, the implication is that the goods were damaged while on the dock and prior to loading in respondents' vessel. However, there is no provision for arbitration in the freight contract of September 1962, nor in the dock receipts, nor in the bills of lading. Furthermore, none of these documents makes any reference whatsoever to the Memorandum of August 21, 1962.

■■ As stated by this Court in Union of Telephone Workers v. New York Telephone Co., 236 F.Supp. 942, at 946 (S.D.N.Y.1964):

Arbitration is, of course, a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit. United Steelworkers of America v. Warrier & Gulf Nav. Co., supra [363 U.S. 574] at p. 582, 80 S.Ct. 1347, at p. 1353 [4 L.Ed.2d 1409]. Whether or not the Company is bound to arbitrate, as well as what issues it must arbitrate, are matters to be determined by the Court on the basis of the agreement entered into between the parties. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed. 2d 462 (1962); John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 546–547, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

■ The mere fact that parties have agreed to arbitrate controversies of a certain class or type obviously does not require them to arbitrate disputes in an entirely different category arising under different documents. Theofano Maritime Co. v. 9.551.19 Long Tons of Chrome Ore, 122 F.Supp. 853 (D.Md.1954); Petition of A/S Falkefjell, 78 F.Supp. 282 (S.D.N.Y.1948); Hotcaveg v. Lightman, 27 Misc.2d 573, 211 N.Y.S.2d 533 (Sup. Ct.1960). In Renis Fabrics Corp. v. Millworth Converting Corp., 25 Misc.2d 280, 201 N.Y.S.2d 13 (Sup.Ct.1960), the Court said at page 282, 201 N.Y.S.2d at 17:

"The fact that a party might have signified willingness to arbitrate some disputes does not bind him to arbitrate all other disputes merely because of the general identity of the adversary interests or the inter-relationship of the transactions involved (See, Matter of Amsterdam Dispatch v. Devery, 254 App.Div. 233, 4 N.Y.S.2d 908, affd., 278 N.Y. 688, 16 N.E.2d 403)".

■ Clause 19 of the bills of lading clearly shows the intent that the contract in those bills was to stand by itself and was not subject to, or controlled by, any prior agreement or agreements. As heretofore noted, there is no provision for arbitration in the bills of lading. The Memorandum of August 21, 1962 is, as noted, a "dual-rate contract" between the Freight Conference and the shipper and governs solely the matter of exclusive patronage of Conference members and the rates to be charged. The conditions of the contract of carriage are left to separate arrangement between the shipper and the Conference member he selects to carry his cargo. This is made clear in paragraph 4 of said Memorandum, which specifies that the terms of carriage are those "contained in the respective Carrier's engagement note, permit, dock receipt and regular form of bill

of lading, in use by the Carrier when shipments are tendered."

The class of disputes covered by the Conference Agreement is shown in a number of decisions thereunder which have been passed on by the courts. American President Lines, Ltd. v. S. Woolman, Inc., 239 F.Supp. 833 (S.D.N.Y.1964) (dispute under dual-rate contract); Joseph Amelar, Inc. v. Far East Conference, 229 F.Supp. 450 (S.D.N.Y.1964) (dispute under dual-rate contract); Parsons & Whittemore, Inc. v. Rederiaktiebolaget Nordstjernan, Sup., 143 N.Y.S.2d 74 (App. Term), aff'd, 286 App.Div. 553, 145 N.Y.S.2d 466 (1st Dep't 1955); Pasch v. Chemoleum Corp., 26 Misc.2d 918, 209 N.Y.S.2d 191 (Sup.Ct.1960), aff'd mem., 13 A.D.2d 470, 214 N.Y.S.2d 644, 645 (1st Dep't 1961). It will be observed that the type of dispute concerned is whether the exclusive patronage provisions were or were not complied with, as for example, when an associated company ships on a non-Conference line.

In the case at bar, the merchandise claimed to have been damaged was received and carried pursuant to the contract bill of lading which, by its terms, expressly excluded all prior agreements and understandings. Therefore, the arbitration clause in the Memorandum can have no application.

The case of Parsons & Whittemore, Inc. v. Rederiaktiebolaget Nordstjernan, 141 F.Supp. 220 (S.D.N.Y.1956), relied upon by libelants is, in fact, authority for the holding that a dispute arising under bills of lading is not within the ambit of a dual-rate contract. (Id. at 225.)

To compel respondents to arbitrate these cargo claims would be to disregard the clear and unambiguous terms of paragraph 4 of the Memorandum, of paragraph 1 of the freight contract, and of paragraph 19 of the bills of lading and rewrite the contract between the parties. There being no obligation on the part of respondents to arbitrate, the libel must also be dismissed as to the Second Cause of Action.

So ordered.